ROLAND L. BELSOME, Judge.
 

 |,Defendant-Appellant, Impatiens, Inc., appeals the trial court’s dismissal of Impatiens’ reconventional demand and judgment in favor of Plaintiff-Appellee, Loving Mother, L.L.C., with regard to a petitory action. For the reasons that follow, we affirm in part and reverse in part.
 

 FACTS AND PROCEDURAL HISTORY
 

 Plaintiff-Appellee, Loving Mother, L.L.C., is a successor entity to the original Plaintiffs, Grieshaber Family Properties, L.L.C., and RJ and AG Schoen Family Properties, L.L.C., and Josephine Wagner Properties, L.L.C. Loving Mother owns two contiguous properties which bear the municipal addresses of 4330 and 4338 St. Charles Avenue, New Orleans, Louisiana. The property located at 4338 St. Charles Avenue, hereinafter referenced as the “Copeland’s Property,” is located at the corner of St. Charles and Napoleon Avenues, and measures 55 feet front on St. Charles Avenue by 120 feet front on Napoleon Avenue. The property located at 4330 St. Charles Avenue, hereinafter referenced as the “Fat Harry’s Property”,
 
 [1]
 
 is contiguous with 4338 St. Charles Avenue, and is 55' from the corner |2of St. Charles Avenue and Napoleon Avenue, and 60' front on St. Charles Avenue by a depth of 120'.
 
 [2]
 

 Loving Mother filed a petitory action on March 29, 2007, asserting ownership of a strip of land located along the rear and side of the Fat Harry’s Property and Copeland’s Property. Loving Mother also asserted that a Servitude of View originally granted on July 14, 1931 had been abandoned, and that the fence’s location deprived Loving Mother of its use and enjoyment of the property.
 

 The Servitude of View was originally established between William Bisso, who then owned the Fat Harry’s Property and Copeland’s Property, and Louis Alba, who then owned 1507 Napoleon Avenue. Defendant-Appellant, Impatiens Inc., now owns 1507 Napoleon Avenue. The servitude consisted of a 20' strip of land along the Napoleon Avenue side of the Copeland’s Property and a 24' strip of land
 
 *192
 
 along the rear side of the Fat Harry’s Property and Copeland’s Property. The servitude was amended on July 22, 1940; the amendment provided that the size of the area affected by the servitude would be reduced to 12' deep along the Napoleon Avenue side of the Copeland’s Property and would be reduced to the rear 20' of the Fat Harry’s and Copeland’s Property. It also prohibited the construction of any structures in any area affected by the servitude.
 

 Louis Alba subsequently sold 1507 Napoleon Avenue to his own company, Alba Company; Alba Company then sold the property to Victor Schiro. Jozsef Toth, the owner of Impatiens, purchased the property from Victor Schiro in 1979. Impatiens purchased the property on March 4,1993, from Jozsef Toth.
 
 [3]
 

 | Jmpatiens, Inc., answered the petition and filed a reconventional demand, asserting that it and its predecessors have been in possession of the strip of land and had acquired ownership of same through thirty years of acquisitive prescription. Impatiens also denied abandonment of the Servitude of View.
 

 The parties stipulated that, at some point more than thirty years prior to March 29, 2007, a fence was placed at the l-ear of the Fat Harry’s Property and Copeland’s Property.
 
 [4]
 
 The parties further stipulated that the fence was in the same location from at least September 20, 1979 until 1983, when the section of the fence that was closest to Napoleon Avenue was moved, as evidenced by a March 4, 1993 survey.
 
 [5]
 
 At trial, the parties stipulated that Loving Mother has paid all of the real estate taxes assessed on the disputed property. The area of land in question is included in Loving Mother’s title and has never been within the boundaries of Impatiens’ title.
 

 Superior Seafood, L.L.C., the tenant of Copeland’s property, intervened as a cross-appellant to protect its interest in the property.
 
 [6]
 

 A bench trial was held on October 7, 2009. At trial, Jozsef Toth, the owner of Impatiens, and Richard Schoen, the manager of Loving Mother, testified, and testimony from Robert Schoen
 
 [7]
 
 was introduced by deposition. Three surveys and numerous other exhibits were introduced into evidence. After taking the matter under advisement, on March 30, 2010, the trial court ruled in favor of Loving LMother as the owner of the subject property, and rejected Impatiens’ acquisitive
 
 *193
 
 prescription claim. The trial court also found, however, that the 20' strip of land along the rear of Loving Mother’s property was still burdened with the Servitude of View in favor of Impatiens’ property. With regard to the Servitude of View burdening the 12' parcel along the Napoleon Avenue side of the property, the trial court determined that it had been abandoned.
 

 In detailed written Reasons for Judgment, the trial court recognized that Mr. Toth purchased 1507 Napoleon Avenue from Victor Schiro in 1979, and that Impatiens was therefore unable to establish thirty years acquisitive prescription without tacking its possession to that of Mr. Toth’s ancestor in title, Mr. Schiro.
 
 [8]
 
 Because the disputed strip of land was included in Loving Mother’s title, pursuant to La. Civ.Code art. 3486,
 
 [9]
 
 in order for Impatiens to acquire the fenced strip of land by acquisitive prescription, Impatiens must have demonstrated corporeal possession for thirty years with the intent to possess as owner.
 
 [10]
 

 Although Mr. Toth argued that the fence, which had no gates or access areas, was evidence of both Mr. Toth’s and Mr. Schiro’s intent to possess as owner, the trial court concluded that neither Impatiens’ nor Mr. Schiro’s intent to possess as owner could be presumed by the existence of a fence. The trial court further found that, consistent with the originally stated purpose of the servitude, the fence was an accommodation to Impatiens’ ancestor in title, Louis R. Alba, for Mr. Alba’s agreement not to oppose William A. Bisso’s proposal to convert the zoning Rof Mr. Bisso’s property from residential to commercial.
 
 [11]
 
 The trial court also acknowl
 
 *194
 
 edged that because the surveys did not clearly set out the fence location, Impatiens had also failed to meet the burden of proving the “limits of its possession” through testimony at trial.
 

 Turning to the issue of the servitude of view, the trial court determined that the servitude of view created a non-apparent negative servitude in favor of Impatiens pursuant to La. Civ.Code arts. 706
 
 [12]
 
 and 707
 
 [13]
 
 . Citing La. Civ.Code arts. 753
 
 [14]
 
 and 754
 
 [15]
 
 , the trial court found that the servitude affected two portions of ground, and that although the servitude had prescribed on the portion of ground | ^measuring 120' front on Napoleon Avenue, it had not prescribed as to the rear of the property.
 

 Impatiens appealed the trial court’s judgment. Loving Mother answered the appeal, joining with Superior Grill, L.L.C., in its cross-appeal, assigning as error and seeking reversal of the trial court’s determination that the servitude of view continued to exist on the twenty-foot portion of ground between the properties, asserting that the entire servitude of "view had been abandoned by ten years of non-use.
 

 STANDARD OF REVIEW
 

 A trial court’s determination with regard to whether a party has possessed property sufficient to establish acquisitive prescription is subject to the manifest error standard of review.
 
 St. John Baptist Church of Phoenix v. Thomas,
 
 08-0687, p. 7 (La.App. 4 Cir. 12/3/08), 1 So.3d 618, 623. Likewise, a lower court’s findings with regard to whether a servitude has been abandoned are governed by the manifest error-clearly wrong standard of review.
 
 See Palace Properties, L.L.C. v. Sizeler Hammond Square Ltd. P’ship,
 
 01-2812 (La.App. 1 Cir. 12/30/02), 839 So.2d 82, 89,
 
 writ denied,
 
 03-0306 (La.4/4/03), 840 So.2d 1219 When the trial court’s factual findings are based on the credibility of witnesses, the court’s decision to credit the testimony of certain witnesses must be afforded deference by the reviewing court.
 
 Id.
 
 (citing
 
 Rosell v. ESCO,
 
 549 So.2d 840, 844 (La.1989)).
 

 DISCUSSION
 

 Assignment of Error # 1
 

 In the first assignment of error, Impatiens asserts that the trial court failed to find that a presumption existed pursuant to La. Civ.Code art. 3427, which provides | Tthat “[o]ne is presumed to intend to possess as owner unless he began to possess in the name of and for another.”
 

 Ownership of immovable property may be acquired through a ten- or thirty-year prescriptive period. La. Civ. Code arts. 3473
 
 et seq.
 
 A possessor of immovable property without just title is
 
 *195
 
 considered a bad-faith possessor and is therefore subject to the thirty-year prescriptive period. La. Civ.Code art. 3486. To establish acquisitive prescription, the bad-faith possessor must demonstrate con
 
 tinuous, uninterrupted,
 
 peaceable, public and
 
 unequivocal
 
 corporeal possession
 
 [16]
 
 for thirty years. La. Civ.Code art. 3476 (emphasis added). Additionally, it is well-settled in Louisiana that the party claiming title to a tract of land by acquisitive prescription bears the burden of proof.
 
 McKoin v. Harper,
 
 36,533, p. 3 (La.App. 2 Cir.1/31/03), 836 So.2d 1260, 1263 (citing
 
 Bowman v. Blankenship,
 
 34,558, p. 4 (La.App. 2 Cir.4/4/01), 785 So.2d 134, 138,
 
 unit denied,
 
 01-1354 (La.6/22/01), 794 So.2d 794).
 

 In this case, Impatiens’ argument lacks merit simply because neither Mr. Toth nor Impatiens established at trial uninterrupted possession for the necessary time period. We agree with the trial court’s conclusion that, even if Impatiens could establish continuous, uninterrupted, peaceable, pub-lie and unequivocal corporeal possession of the area of land in dispute, Impatiens did not demonstrate such possession for thirty years; Mr. Toth purchased the property in 1979, and this action was filed in March of 2007, leaving a void of two years for acquisitive prescription.
 
 [17]
 
 Thus, assuming
 
 arguendo
 
 that Impatiens had actually established ^possession from 1979 through 2007, Impatiens did not set forth any evidence that Mr. Schiro intended to possess the area of land in dispute.
 
 See
 
 La. Civ. Code art. 3442.
 

 Furthermore, Impatiens did not demonstrate at trial continuous, uninterrupted, peaceable, public and unequivocal corporeal possession for any period of time. Richard Schoen, the manager and custodian of the records for Loving Mother, L.L.C.,
 
 [18]
 
 testified that his ancestors in title maintained and reconstructed a portion of the fence within the last thirty years, and actually moved a portion of the fence towards the 1507 Napoleon property.
 
 [19]
 
 Additional
 
 *196
 
 ly, |nRichard Schoen testified that he and other family members used the strip of land over the last thirty years to trim the trees to prevent fire hazards,
 
 [20]
 
 and also used the area in question to socialize with friends during Mardi Gras and other times during the late 1970s and early 1980s.
 
 [21]
 
 
 *197
 
 He further testified that Loving Mother did not abandon the subject property.
 
 [22]
 

 Additionally, as the trial court recognized, the existence of the servitude (which was explicitly included in the Act of Sale from Mr. Schiro to Mr. Toth) deemed Mr. Schiro, Mr. Toth, and Impatiens precarious possessors pursuant to La. hnCiv.Code arts. 3437
 
 [23]
 
 and 3438.
 
 [24]
 
 Accordingly, acquisitive prescription could not run. La. Civ.Code art. 3477;
 
 [25]
 
 see
 
 also Delacroix Corp. v. Perez,
 
 98-2447, p. 5 (La.App. 4 Cir.11/8/00), 794 So.2d 862, 866,
 
 writ denied,
 
 00-3245 (La.1/26/01), 782 So.2d 635. “Acquisitive prescription does not run in favor of a precarious possessor or his universal successor, who is presumed to possess for another although he may intend to possess for himself.”
 
 Id.
 

 Furthermore, there is no evidence that the possession changed from precarious or that the nature of the possession changed by acts sufficient to put Loving Mother on notice of such a change.
 
 See Delacroix,
 
 p. 9, 794 So.2d at 868; La. Civ.Code arts. 3439
 
 [26]
 
 and 3478.
 
 [27]
 
 Richard Schoen testified at trial that at no time was anyone told to leave the property, nor did he or any other family member receive notice from Mr. Toth or Impatiens that Mr. Toth intended to take possession of the strip of land.
 

 Servitude of View — Cross Appeal
 

 With regard to the trial court’s findings regarding the servitude of view, although the language in the 1931 document purports to make the servitude irrevocable, the servitude can nevertheless be abandoned from ten years of nonjuse.11 La. Civ.Code art. 753; see
 
 also Roba, Inc. v. Courtney,
 
 09-0509, p. 8 (LaApp. 1 Cir.8/10/10), 47 So.3d 509, 515 (“If a predial servitude is not used for ten years, it is extinguished”);
 
 Vincent v. Meaux,
 
 325 So.2d 346, 348 (La.App. 3 Cir.1975) (finding that “[i]n order to have kept the servi
 
 *198
 
 tude viable, it was necessary for the plaintiff to have used it at least once every ten years since its creation”).
 

 We find that the trial court erred in concluding that although the servitude had plainly prescribed on the portion of ground facing Napoleon Avenue, it had not prescribed as to the rear of the property. Although the servitude of view affects two portions of ground, only one servitude exists. Furthermore, with respect to affirmative servitudes, a partial use of the servitude constitutes the use of the whole for prescription purposes.
 
 Dupont v. Hebert,
 
 06-2384, p. 7 (La.App. 1 Cir. 2/20/08), 984 So.2d 800, 806. Similarly, in this case, the partial adverse use of the negative servitude constituted adverse use of the servitude in its entirety. Accordingly, the trial court erred in finding that the servitude of view had prescribed only in part.
 

 Assignment of Error # 2
 

 In the second and final assignment of error, Impatiens asserts that the trial court erred by concluding that the surveys in evidence did not clearly set out the fence location.
 

 Upon reviewing the surveys introduced into evidence, we do not find that the surveys definitively establish a clear location of the fence over a thirty year period. Furthermore, as discussed previously herein, Mr. Schiro did not testify, and his intent to possess as owner is not evidenced simply by the existence of the fence.
 

 | ^CONCLUSION
 

 For the foregoing reasons, the trial court’s judgment is affirmed with respect to the petitory action in favor of Loving Mother, L.L.C., and dismissing Impatiens’ reconventional demand. The judgment is also affirmed with regard to the finding that the Servitude of View on the portion of ground measuring 120' front on Napoleon Avenue by 12' in the direction of General Pershing Street had prescribed by nonuse.
 

 The portion of the trial court’s judgment in favor of Impatiens and finding that Loving Mother’s property is burdened with a Servitude of View on the portion of property measuring 20' from the rear line of the property is hereby reversed.
 

 AFFIRMED IN PART; REVERSED IN PART
 

 [1]
 

 . The record evidences that by act of cash sale dated December 14, 1944, Morris W. Newman sold Jennie Carra Grieshaber property bearing the municipal address of 4330-34 St. Charles Avenue. It is on this land that the building that is Fat Harry’s today was constructed. The title to the Fat Harry’s property was passed to Ms. Grieshaber's descendants upon her death, and Ms. Griesha-ber's children acquired the Copeland's property in 1981.
 

 [2]
 

 . As noted in the joint stipulation at trial, the Fat Harry’s Property has been conveyed in an unbroken chain of title by the ancestor-in-title, Jennie Carra Grieshaber, to Loving Mother, L.L.C. Loving Mother acquired its interest in the property in an act of exchange dated November 19, 2007.
 

 [3]
 

 . The record evidences that a sale of 1507 Napoleon Avenue property on October 1, 1979 from Mr. and Mrs. Victor H. Schiro to Jackson Homestead Association; a sale of the property dated October 1, 1979 by Jackson Homestead Association to Jozsef Toth; a
 
 dation en paiement
 
 dated March 4, 1993, by Jozsef Toth to Impatiens, Inc.; and a quitclaim executed by Jozsef Toth in favor of Impatiens, Inc., on March 31, 1993.
 

 [4]
 

 . Prior to Loving Mother’s procurement of the Copeland’s property, a fence was placed on the rear of
 
 the
 
 property which joined with the fence behind the Fat Harry’s property.
 

 [5]
 

 . In 1983, Mr. Toth made an agreement with Copeland’s restaurant to relocate a portion of the western end of the fence. The fence was moved a few feet toward the apartment building, allowing space for restaurant equipment. This relocation of the fence is reflected in the March 4, 1993 survey.
 

 [6]
 

 . Superior Seafood asserts in its brief that it appeared as Intervenor on the basis of its five-year lease of land and improvements at 4330 and 4338 St. Charles Avenue, and acknowledges that its interests are aligned with those of Loving Mother.
 

 [7]
 

 . Robert Schoen is Agatha Grieshaber's husband. Agatha Grieshaber is the sister of Judge Dom Grieshaber and Josephine Wagner.
 

 [8]
 

 .
 
 See
 
 La. Civ.Code art. 3442 ("The possession of the transferor is tacked to that of the transferee if there has been no interruption of possession.”).
 

 [9]
 

 . "Ownership and other real rights in immov-ables may be acquired by the prescription of thirty years without the need of just title or possession in good faith.” La. Civ.Code art. 3486.
 

 [10]
 

 . Mr. Schiro did not testify.
 

 [11]
 

 . The Servitude of View was granted by Mr. Bisso in the 1931 document as follows:
 

 Appearer further declared that for and in consideration of and upon the terms and conditions hereinafter set forth, he does by these presents irrevo[c]ably grant and establish a servitude of view in favor of the property belonging to LOUIS R. ALBA, which property adjoins appearer’s above said property and which measures fifty feet front on Napoleon Avenue by One hundred and twenty feet in depth, on which stands the Jefferson Apartments, known by the Municipal No. 1507 Napoleon Avenue, which servitude the said Louis R. Alba does by these presents accept.
 

 The servitude of view herein granted and established by appearer being on that portion of his ground measuring one hundred and twenty feet front on Napoleon Avenue by a width or depth of twenty feet in the direction of General Pershing street; and a portion forming the rear of appearer's said ground measuring twenty-four feet from the rear line of appearer’s said ground and extending in the direction of St. Charles Avenue, being twenty percent of the depth of appearer's said property.
 

 The 1931 document further provided that "[f]or the purpose of maintaining said servitude of view, the appearer herein binds and obligates himself, his heirs and assigns not to construct any building or obstruction of any character whatsoever on the said set back of twenty feet on Napoleon Avenue and the twenty-four feet on the rear of said property as hereinabove described.” The servitude was granted and established for the consideration of $300.00, "and in further consideration and compromise of the said Louis R. [Ajlba abandoning any of his rights whatsoever which he has or may have to oppose the proposed change in the zoning of the ap-pearer’s property from residential to ‘G’ commercial ... which change however is not in anywise to effect the servitude herein established.”
 

 [12]
 

 . La. Civ.Code art. 706 provides, in pertinent part:
 

 Negative servitudes are those that impose on the owner of the servient estate the duty to abstain from doing something on his estate. Such are the servitudes of prohibition of building and of the use of an estate as a commercial or industrial establishment.
 

 [13]
 

 . La. Civ.Code art. 707 provides, in pertinent part:
 

 Nonapparent servitudes are those that have no exterior sign of their existence; such as the prohibition of building on an estate or of building above a particular height.
 

 [14]
 

 . “A predial servitude is extinguished by nonuse for ten years.” La. Civ.Code art. 753
 

 [15]
 

 . La. Civ.Code art. 754 provides as follows:
 

 Prescription of nonuse begins to run for affirmative servitudes from the date of their last use, and for negative servitudes from the date of the occurrence of an event contrary to the servitude. An event contrary to the servitude is such as the destruction of works necessary for its exercise or the construction of works that prevent its exercise.
 

 [16]
 

 . "Corporeal possession is the exercise of physical acts of use, detention, or enjoyment over a thing." La. Civ.Code art. 3425.
 

 [17]
 

 . The time period for acquisitive prescription was interrupted by the petitory action filed by Loving Mother.
 
 See
 
 La. Civ.Code art. 3462 ("[prescription is interrupted when the owner commences action against the possessor, or when the obligee commences action against the obligor, in a court of competent jurisdiction and venue”).
 

 [18]
 

 . Richard Schoen testified at trial that his father preceded him as the manager of the properties.
 

 [19]
 

 . Richard Schoen testified that he first became involved in the property in the 1970s, and testified with regard to his personal knowledge of the purpose and maintenance of the fence in the late 1970s:
 

 Q. Well, let's fast-forward to the '70s, when you were a major; you were over the age of 18. What did you do around the property in the 70s?
 

 A. It was, it was an Uptown gathering spot for all of our friends; went through — saw a number of different managers go through the building, the business; was involved in the major renovations of the building when we put the archway doors on the front, redid the bar. I've been very involved with this building since I was a teenager, if that answers your question.
 

 Q. Let’s talk about the rear of the building and specifically the alleyway and fence. Did you have occasion to work on or in this area?
 

 ⅜ ⅝ * ⅜
 

 A. During the renovations of the building in the late '70s, the back exit door where the kitchen was — ‘cause we were renovating the kitchen at that time, Your Honor. I don't know if you remember that. But we poured a slab out the back. A lot of the boards were missing off the fence back there. The fence was always there to have some place to put the trash until we could take it to Napoleon.
 

 Q. We're talking about the Fat Harry’s rear portion?
 

 
 *196
 
 A. Yes, sir.
 

 ⅜ ⅛ ⅜ ⅝
 

 A. Of my own personal knowledge, that fence was there to have some place to throw the trash where it wasn’t in plain view of the adjoining property. We had to put it somewhere until you could haul it out to the curb for collection once or twice a week.
 

 Q. You said you replaced fence boards. Describe the fence back in the late '70s behind Fat Harry's and Copeland’s, what we — soon became known as "Copeland’s”?
 

 A. The fence was always very rickety, was built between the trees. The trees were almost the poles. A lot of the fence sections were down. What we decided to do when we renovated the place — We bought these very heavy rubber mats, if I could elaborate. You know, they go on the floor behind the bar, Judge. And they would take these mats out, and they’d have to wash them out 'cause all the alcohol and the beer spillage on them. So we had to reinforce the fence so we could hang those heavy mats on there and hose them off. So I know that we rebuilt that section of the fence at that time because it was boards missing on it and we had to restructure the braces on it.
 

 Q. And this is the late '70s?
 

 A. This is the very late '70s.
 

 [[Image here]]
 

 Q. Did the guy next door, whoever he was, Vic Schiro, whoever owned the apartment building, come out and object to the fence going up?
 

 A. No.
 

 [[Image here]]
 

 Q. Okay. Behind Fat Harry's, you actually drilled new holes, right, for the fence posts?
 

 A. The four-by-fours.
 

 Q. Right. Okay. So you sunk four-by-fours in. Did you pour concrete?
 

 A. Yeah, of course. You've got to hold the pole.
 

 Q. And you set new fence posts?
 

 A. Right.
 

 Q. That was just the part behind Fat Harry's?
 

 A. That’s correct.
 

 Q. Okay. That’s an entirely new fence?
 

 A. Okay.
 

 Q. Moved closer to the building, to the apartment building?
 

 A. Yes, further away from our building, yes.
 

 [20]
 

 . Richard Schoen testified with regard to the family’s maintenance of the trees of the strip of land during the 1980s and 1990s:
 

 Q. What did you do on that strip of land in the late '70s?
 

 A. For lack of a better word, we used to party on it. I mean, we had access to it.
 

 Q. What about, shall we say, after you may have matured? What did you do in the '80s and '90s, if anything at all, on that strip of land?
 

 [[Image here]]
 

 A. Occasionally. We were trying to prevent a fire hazard. And the fire hazard was they had several trees that were in the back of the building that Carl had the exhaust— Carl was the manager of Fat Harry's — the exhaust vents from his kitchen area that ran up the back side of the building. And the tree limbs would come over on those exhaust fans and hoods. And we were always afraid that those were gonna catch fire because of the way it was. And we'd have to go back over there and trim the trees, whether we did it from the roof or we did it from the fence on the other side. But we had to cut those trees back to keep them away from the heated exhaust vents, if that's okay to say that.
 

 [21]
 

 . Richard Schoen testified that family members and friends would use the area of land in question during the late 1970s and early 1980s:
 

 Q. What other use were you personally involved in?
 

 A. I used to go back there sometimes around Mardi Gras times with friends. It wasn’t that unusual on a — I don’t know. It was late '70s, early '80s. Just to get out of Fat Harry’s for a while, we used to go back there on the patio furniture, kind of a disco thing where you'd be dancing all night long. You just wanted to get away, you know. And we would take our drinks back
 
 *197
 
 there, and that was normally a Friday, Saturday night kind of a thing.
 

 [22]
 

 . Richard Schoen testified that the rear of the properties was considered to be a "buffer zone” that was not ever abandoned by Loving Mother:
 

 So let me digress. We didn't have a problem with the rear property the way it was. It was designed as a buffer zone between the properties. We tried to protect the buffer zone by putting up a fence. We put the garbage out in the back; that’s what it was designed — been doing that for 50 years. We didn't have a problem with the neighbors using the property; we used the property. We maintained the property; they maintained the property. This has never been in question. We never, ever decided to abandon this property. It was always ours.
 

 [23]
 

 . "The exercise of possession over a thing with the permission of or on behalf of the owner or possessor is precarious possession.” La. Civ.Code art. 3437.
 

 [24]
 

 . "A precarious possessor, such as a lessee or a depositary, is presumed to possess for another although he may intend to possess for himself.” La. Civ.Code art. 3438.
 

 [25]
 

 . "Acquisitive prescription does not run in favor of a precarious possessor or his universal successor.” La. Civ.Code art. 3477.
 

 [26]
 

 . La. Civ.Code art. 3439 provides that "[a]ny other precarious possessor, or his universal successor, commences to possess for himself when he gives actual notice of this intent to the person on whose behalf he is possessing.”
 

 [27]
 

 . La. Civ.Code art. 3478 provides as follows:
 

 A co-owner, or his universal successor, may commence to prescribe when he demonstrates by overt and unambiguous acts sufficient to give notice to his co-owner that he intends to possess the property for himself. The acquisition and recordation of a title from a person other than a co-owner thus may mark the commencement of prescription.
 

 Any other precarious possessor, or his universal successor, may commence to prescribe when he gives actual notice to the person on whose behalf he is possessing that he intends to possess for himself.