PARRO, J.
In this petitory action, Charles E. Griffin, II, appeals a trial court judgment declaring that the title to his property extends only to the center of the “public road,” being Morris Road. We reverse, render, and remand.
*722 FACTUAL AND PROCEDURAL BACKGROUND
This case involves a dispute over the meaning of the words “public road” in a 1941 partition document, in which property formerly owned by Green D. Spillman was divided by his heirs into five lots. Both parties in this lawsuit trace their titles to the disputed properties to this partition document, which described the boundaries of the partitioned properties with reference to the “public road” lying between and alongside them. The parties stipulated that the “public road” that is the source of the controversy was reworked and renamed between 1932 and 1935. The new name is Morris Road, and it generally tracks the roadbed of the former road, which was known as the New Hope-Whitaker Springs Road. In the area involved in this dispute, Morris Road lies somewhat west of the former roadbed. The current location of Morris Road was in place and used as a public road when the partition agreement was executed and filed of record in 1941. The property involved in the partition lies in Sections 55 and 56 of Township 1 South, Range 2 West, in West Feliciana Parish. Where the property at issue in this case is located, Morris Road runs generally north/south through Sections 55 and 56, almost perpendicular to the common east/west line separating these sections. A sketch attached to the partition document depicts the disputed boundary as one straight road, which is labeled, “public road.”
The title to the portion of Griffin’s property at issue can be traced to a tract on the west side of the road in Section 55. This tract became Lot One in the 1941 partition and became the property of Leslie R. Spillman. The partition document describes this property, in pertinent part, as “[tjhirteen acres, more or less, and bounded on the North by Highway No. | h258, and by lands of Leslie R. Spillman, on the East by the Public Road, on the South by lands of Charles Griffin,[2] and on the West by State Highway No. 258.” The sketch attached to the partition document shows that the northern portion of Lot One lies opposite a large tract owned by Llewelyn Spillman.[3] Because title to this fifty-acre tract had passed to Llewelyn Spillman in 1927 and its western boundary was the “public road” in existence at that time, the parties agree that its boundary is the old road. This existing boundary could not be altered by the partition. Therefore, the parties agree that where the property comprising Lot One lies opposite the fifty-acre tract, the “public road” referenced in the partition document as Lot One’s eastern boundary is the old road.
The southernmost portion of Lot One lies opposite a considerably larger tract that was also part of the partition. This larger tract — about 316 acres — on the east side of the road was partitioned into four large lots, Lots Two, Three, Four, and Five. The partition document describes the westernmost boundary of these lots as the “public road.” The sketch attached to the partition shows that Lot Two straddles the section line between Sections 55 and 56, with its southern portion located in Section 56. Lots Three, Four, and Five lie south of Lot Two and are entirely within Section 56. According to the sketch attached to the partition, the portion of Lot Two in Section 56 and all of Lots Three, Four, and Five are located across the road from property owned at that time by Charles Griffin, the plaintiffs grandfather, who bought it in 1921. This existing boundary also could not be altered by the partition. Therefore, the parties agree that the old public road forms the western boundary of Lots Three, Four, and Five, and of the portion of Lot Two located south of the section line.
*723 The controversy involves the small stretch of “public road” forming the boundary between the southern portion of Lot One on the west side of the road and the northern portion of Lot Two across from it on the east side of the road. In 1998 the defendants, Donald Hugh and Geraldine Bourgeois Daigle, purchased property on the east side of the road in Sections 55 and 56. The title to the portion of their property at issue is traced back to Lot Two of the partition, which in that document became the property of I ¿Llewelyn Spillman.[4] A survey performed in connection with this purchase depicts the centerline of the old public road as the Daigles’ western property line where their property in Section 56 lies across the road from the property Griffin acquired from his grandfather. However, according to this survey, the Daigles’ western property line does not continue to track the old public road north of the section line. Rather, the line shifts about thirty feet due west on the section line between Sections 55 and 56 and proceeds northward along the centerline of the present public road. The present public road, Morris Road, lies to the west of the old road at this point. Therefore, the portion of the Daigles’ property located between the centerline of the old road and the centerline of the new road encroaches on property claimed by Griffin under his title traced back to Lot One. The recordation of this survey and transfer document to the Daigles is the first documented indication that ownership of property between the two roads is claimed by the Daigles or their ancestors in title.
Griffin bought the Lot One property and a small one-acre parcel just north of it in 1985. The property description for this purchase shows his property is bordered on the east by the “public road (New Hope-Whitaker).” The clarifying parenthetical first appeared in Griffin’s chain of title in 1955, when Leslie R. Spillman sold the property he had received in the partition to his brother. In that document, the property is described, in pertinent part, as:
largely triangular in shape more particularly described as bounded: North by State Highway 258; South by C.E. Griffin; East by Public Road (New Hope-Whittaker); West by State Highway 258, containing Fourteen (14) acres, more or less, being a portion of the Green Davis Spillman property acquired by Vendor from the Estate of the Former.
The reference to the New Hope-Whitaker Springs Road is included in all subsequent conveyances in Griffin’s chain of title. Based on this description, Griffin claims his property extends to the centerline of the old roadbed, the New Hope-Whitaker Springs Road, rather than to the center-line of the present public road, which is Morris Road. On a survey recorded by Griffin in March 1998, the eastern boundary of his property is |Bshown as the cen-terline of the old public road. When Griffin became aware of the Daigle purchase in November 1998 and the survey upon which their property description was based, he took the steps that ultimately culminated in this lawsuit.
Griffin’s suit asked for a declaratory judgment in his favor declaring him the true and lawful owner of the property described in the petition, amending the Daigles’ purchase document to clarify that the western boundary of their property is the centerline of the old road, and enjoining any further acts that might constitute a cloud on his title or a trespass on his property. The court signed a preliminary injunction and scheduled a hearing on a permanent injunction. The Daigles responded with a dilatory exception to the unauthorized use of summary proceeding and a motion to dissolve the preliminary injunction. The court scheduled the hearing on the Daigles’ exception and motion *724 for the same day and time as the hearing on the permanent injunction.
In connection with that hearing, the parties entered a stipulation, which the court adopted and entered as a stipulated judgment on February 3, 1999. In that judgment, the Daigles were ordered to refrain from filing any other documents that might cloud Griffin’s title and to refrain from using or possessing the disputed property pending a final judgment. The judgment recognized that the area in dispute was shown on the attached partial copy of a survey and consisted of an area located between the centerline of the old road and the centerline of the current Morris Road. The judgment also stated that the original petition filed by Griffin was to be regarded by the parties and the court as a petitory action governed under the provisions of Louisiana Code of Civil Procedure articles 3651, et seq. The judgment further provided that the status quo was to be preserved pending final judgment; therefore, the preliminary injunction was dissolved and the Daigles’ motion and exception were considered pretermit-ted and withdrawn.
After a trial, the court stated in written reasons:
At issue here is the eastern boundary of Lot Number One received by Leslie R. Spillman in the partition which is now owned by Griffin. Plaintiff argues that the public road described as the eastern boundary of the tract is not the public road as it existed at the time of the partition and now but rather is the cen-terline of the road bed as it existed prior to the mid 1930’s.
| fiThat argument is not persuasive. It is not reasonable to think that parties entering into a voluntary act of partition would divide land so that one landowner, Leslie Spillman, received a portion of his land across a public road and in a configuration that is virtually useless, varying in width from zero to thirty plus feet and back to zero, and that the other owner would agree to accept a virtually enclosed estate with only a few feet of road frontage. The more reasonable interpretation of what the parties meant by public road was the public road. That is the Morris Road.
Therefore, the Court finds that the title of plaintiff extends only to the public road, Morris Road. This petitory action is ill founded and the Court will sign a judgment dismissing it with prejudice.
A judgment in accord with these reasons was signed on May 25, 1999, and this appeal followed.
APPLICABLE LAW
The petitory action is one brought by a person who claims the ownership, but who is not in possession, of immovable property, against another who is in possession or who claims the ownership thereof adversely, to obtain judgment recognizing the plaintiffs ownership.[5] LSA-C.C.P. art. 3651; Lafourche Realty Co., Inc. v. Duard Eymard Co., Inc., 93-1278 (La.App. 1st Cir.6/24/94), 638 So.2d 1138, 1139, writ denied, 94-1991 (La.11/11/94), 644 So.2d 390. To obtain a judgment recognizing his ownership of immovable property, the plaintiff in a petito-ry action must: (1) prove that he acquired ownership from a previous owner or by *725 acquisitive prescription, if the court finds that the defendant is in possession of the property; or (2) prove a better title thereto than the defendant, if the court finds that the latter is not in possession thereof. Therefore, the first issue that must be determined in a petitory action is the question of current possession. Mt. Everett African Methodist Episcopal Church v. Carter, 96-2591 (La.App. 1st Cir.12/29/97), 705 So.2d 1179, 1181. The defendant’s possession, or lack of it, determines the burden of proof imposed on the plaintiff. See LSA-C.C.P. art. 3651, Official Revision Comments (a); Joffrion v. Scioneaux, 506 So.2d 512, 513-14 (La.App.7 1st Cir.1986), writ denied, 505 So.2d 1132 (La.1987). When the titles of the parties are traced to a common author, he is presumed to be the previous owner. LSA-C.C.P. art. 3653; LSA-C.C. arts. 531 and 532.
The possession required to put the more onerous burden on the plaintiff is the same possession required to initiate the possessory action or to establish acquisitive prescription. LSA-C.C.P. art. 3660; Ryder v. Lacour, 322 So.2d 243, 245 (La.App. 3rd Cir.1975), writ not considered, 325 So.2d 274 (La.1976). The defendant is in possession when he and his ancestors in title have had corporeal possession for at least one year or civil possession for the same period of time preceded by corporeal possession. See A.N. Yiannopoulos, Louisiana Civil Law Treatise: Property, § 264, at 519 (3rd ed.1991); LSA-C.C.P. arts. 3658 and 3660; LSA-C.C. art. 3476. Corporeal possession is the exercise of physical acts of use, detention, or enjoyment over the property. LSA-C.C. art. 3425. For acquisitive prescription, it must be continuous, uninterrupted, peaceable, public, and unequivocal. LSA-C.C. art. 3476. Corporeal possession in a particular case is governed by the nature of the land and the use to which it is put. Prieto v. St. Tammany Homesites, Inc., 602 So.2d 1111, 1114 (La.App. 1st Cir.1992). Once acquired, possession is retained by the intent to possess as owner even if corporeal possession ceases. This is civil possession. LSA-C.C. art. 3431.
Physical occupancy of any part of a tract specifically described in a deed with the intent to possess the whole will constitute possession of all the property included therein. The possessor of land claiming ownership by possession rather than title must have uninterrupted possession with the intent to possess as owner. Prieto, 602 So.2d at 1114. Possession may be interrupted by disturbances in fact or law. A disturbance in fact is any physical act which prevents the possessor of immovable property from enjoying his possession quietly, or which throws any obstacle in the way of that enjoyment. LSA-C.C.P. art. 3659. A disturbance in law is the execution, recordation, registry, or continuing existence of record of any instrument which asserts or implies a right of ownership to immovable property adversely to the possessor of such property. LSA-C.C.P. art. 3659.
J^ANALYSIS
First, we note that some of the facts recited by the trial court in written reasons for judgment are not borne out by the record. The property conveyed to Leslie R. Spillman in the partition did not include a portion of land across Morris Road “varying in width from zero to thirty plus feet and back to zero,” as the trial court stated. All of the surveys, maps, and testimony in the record show that the Lot One property was bounded for most of its eastern boundary by the old road, because the northern portion of Lot One was opposite the 50-acre tract already belonging to Llewellyn Spillman. This pre-exist-ing boundary resulted in the allocation to Leslie R. Spillman of a strip of property between the new and old roadbeds that varied in width, because the two roadbeds coincided for some distance before Morris Road gradually shifted west. However, at the southern end of Lot One, where the disputed property from Lot One lies across from what became Lot Two in the parti *726 tion, the strip of property does not vary significantly in width. The testimony and survey maps indicate a width of 21.5 feet to 31.8 feet, according to the defendants’ expert, or 25 to 35 feet, according to the plaintiffs expert. At no point does the disputed strip narrow back to zero in the property conveyed to Leslie R. Spillman. Another factual discrepancy in the trial court’s reasons concerns the frontage of Lot Two. The Lot Two property conveyed to Llewellyn Spillman in that partition did not result in his acceptance of “a virtually enclosed estate with only a few feet of road frontage.” He already owned the fifty-acre tract to the north of the Lot Two property. For some distance at its northern end, the fifty-acre tract fronted on Morris Road, where the new and old roadbeds were the same. Similarly, at the southern end of Lot Two, the two roadbeds coincided for a distance of over 200 feet. Therefore, the property owned by Llewellyn Spillman after the partition had Morris Road frontage at its northern and southern ends.[6] These factual recitations of the trial court are manifestly erroneous.
We also find legal error in the proceedings. Although the parties stipulated that | nthis action was to be treated as a petitory action and the court rendered judgment in accord with that stipulation, the court’s written reasons after the trial of this matter do not reflect that the court actually considered any of the factors involved in such an action. As required by the statutes and developed by the jurisprudence, the burden of proof on Griffin depends on whether or not the Daigles were in possession of the property. The trial court did not address that issue at all. In fact, it does not appear from the court’s reasons for judgment that it actually utilized the substantive and procedural law pertaining to petitory actions. Yet it is clear from Griffin’s petition and from the stipulated judgment that this case does fall within the parameters of such an action.[7] Under this circumstance, we find legal error in the trial court’s judgment. Having found manifest error and legal error, this court must conduct a de novo review of the record. See Evans v. Lungrin, 97-0541, 97-0577 (La.2/6/98), 708 So.2d 731, 735.
The first step in that review is to examine the seminal issue of whether the Dai-gles were in possession of the property at issue. Mr. Daigle testified that he simply assumed the western boundary of the property he purchased extended to Morris Road. He had looked at that portion of the property and noticed an old fence with what appeared to be a drainage area between the fence and Morris Road. He did not do anything on the property at issue.
Helen Spillman Miller, who sold the property to the Daigles, stated that years ago when she was growing up there, she had regularly crossed the disputed area to get to her father’s garden at the back of the property. However, Ms. Miller said she had moved away after l^orld War II and did not return to the area until 1991. She also testified that after Griffin bought the property across the road in 1985, members of her family continued to cross that area for access to her property; in particular, her sons used it when they hunted there. However, when Ms. Miller identified the gap in the fence from a photograph, it appeared that the spot she had identified as the access path was not within the disputed portion of the property. Rather, it was located at a Imspot further south where the old roadbed and new roadbed coincided. Therefore, this area of passage was not within the disputed portion. Ms. Miller also said that in 1994, some timber was harvested on her property and the logging truck pushed through the old fence and took the lumber out through the disputed area. Griffin eon- *727 fronted her about this situation when it occurred and asked her to sign a servitude agreement. She did not sign it, but instead re-installed fencing along the old fence line. She located a gate for access to her property south of the disputed portion, where the property touches Morris Road.
Her son, Andrew Miller, said there was a crossing in the disputed area that he and his brother used to go to the back of the property to form food plots for hunting and to hunt. They had used this as a right-of-way about a dozen to two dozen times, the last time about two years before the trial. However, after the logging truck pushed through that area, his mother re-fenced it along the old fence line; they then accessed the property through the gate on Morris Road.
Ms. Miller’s brother, W.D. Spillman, also testified. He said he advised his sister not to sign the servitude agreement, because she, not Griffin, owned that property. Neither he nor his sister put up any posted signs, and he did not recall seeing the ones Griffin had put up in the disputed area. Mr. Spillman acknowledged that an old fence on his sister’s property was behind the old road and had been there for as long as he could remember. He said there was no room to erect a fence along the new roadbed. Mr. Spillman described the old roadbed as looking more like a ditch, with trees and bushes growing up in the middle of it. However, for some time there had been an entrance that the Spill-man family used to go back and forth across the disputed property to get to the back of their property. This entrance did not drain well, so the gate was installed at its present location on Morris Road. He said his sister’s property became overgrown every year and he would burn it off all the way to the edge of Morris Road. Mr. Spillman admitted that Griffin complained to him about this several times, because Griffin did not want any burning on the portion he claimed to own. About eight years earlier, the fire had spread to an old barn and Mr. Spillman had pushed the remnants and debris into the old roadbed. Griffin also complained to him l^about this, and Mr. Spillman recalled that his response was, “Well, Charles, I didn’t push it but half way, but the property isn’t yours to start with.”
Griffin testified that he was upset by the trespass on his property in 1994 when the logging truck cut through the fence. When he learned the logging contractor had simply made an error about where to exit the property, he left the fence down long enough for the loggers to get out the last half load. Then he prepared the servitude agreement for Ms. Miller to sign. She refused, but had someone put up a new fence where the old fence had always been; she also had a gate installed further south where her property fronted on Morris Road. Other than the logging truck incident, he knew of no acts of possession by the Spillmans or Millers. Griffin said he did not want his property burned because it looked bad and because he had planted some cypress, walnut, and oak trees in the old roadbed. When the old barn burned, Mr. Spillman pushed it only as far as his half of the old roadbed. Griffin said the gap described by Mr. Spill-man and the Millers was not in the area in dispute, which was bounded alongside the old roadbed for its entire length by an old wire fence. In March 1998, Griffin recorded a survey clearly showing the old roadbed as the eastern boundary of his property.
From the facts presented, we are unable to conclude that the Daigles had possession of the property in dispute. It is clear that the Daigles’ predecessors possessed the property up to the fence line, which was east of and alongside the old roadbed. Although a party with a just title who possesses a portion of his property is presumed to possess to the full extent of the area specifically described in his title, it is the extent of the Daigles’ title that is at issue here. It is because the area between the two roadbeds is not specifically de *728 scribed that this case is before us. Therefore, this presumption does not assist in establishing the Daigles’ or their predecessors’ possession of the disputed property. Furthermore, it is not clear from the testimony of Mr. Spillman or the Millers that their sporadic entrance through property beyond the fence line fell within the area that is actually in dispute in this case, rather than at a point south of the disputed property. Mr. Spillman’s burning of the fields that sometimes encroached on the disputed area seems less an intentional act of ownership |1?fhan an unintentional failure to control the burning. Indeed, his statement that he only pushed the burned barn debris “half way” into the old roadbed supports an inference that he recognized Griffin claimed ownership of the other half of the roadbed, even if he did not agree with that claim. Certainly since 1985, when Griffin bought his property, he has consistently challenged anyone else’s attempts to use or possess that area. It is obvious that no one else had the full enjoyment of the disputed property, because every time anyone attempted to do anything there, Griffin interfered. Ultimately, a disturbance in law occurred some months before the Daigles bought the property, when Griffin filed the survey that clearly depicted his claim to ownership of the disputed area. Therefore we find the evidence of possession by the Dai-gles and their predecessors was insufficient to establish that they had continuous, uninterrupted, peaceable, public, and unequivocal possession of the disputed area.
Because we conclude the Daigles have not shown they are in possession of the property, Griffin bears the burden of proving better title to the disputed area. “Better title” is a slippery concept. A commentator has remarked:
The difficulty in defining an expression as nebulous as better title has proven almost insurmountable. No definition can fully account for the infinite variety of factual situations that arise when parties attempt to trace titles from records that date from over one hundred years ago and that often prove inaccurate.
Camille B. Poche, Comment, Better Title: An Examination of the Burden of Proof in Louisiana Petitory Actions, 67 Tul. L.Rev. 511, 540 (1992).
In some cases in which title is traced back to a common author, the courts have concluded that the more ancient title is the better title. See LSA-C.C. art. 532, Revision Comments—1979, comment (a); Williamson v. Kelly, 520 So.2d 868, 872 (La.App. 3rd Cir.1987), writ denied, 522 So.2d 562 (La.1988). However, in the case we are reviewing, the common author was the estate of Green D. Spillman, and the transfer to both parties’ ancestors in title occurred simultaneously in the act of partition. Therefore, this case cannot be resolved by reference to that principle. In other cases, the term “better title” has been applied when neither party has a perfect title, but the property description in one title is more precise than that of the other. See Gore v. Ronaldson, 200 So.2d 46 (La.App. 1st Cir.), writ denied, 251 La. 68, 203 So.2d 87 (1967); Tinney v. Lauve, 280 So.2d 588 (La.App. 4th Cir.1973). However, in this case the dispute arises because of the use of a single term in both chains of title — the “public road.” Therefore one title in this case is no more precise than the other. Yet another general rule is that where there are differences between the textual description of the property conveyed and the description shown on a plat of survey, the plat of survey will control and govern the conveyance. Gore, 200 So.2d at 51; Hayward v. Noel, 225 So.2d 638 (La.App. 1st Cir.), writ refused, 254 La. 857, 227 So.2d 595 (1969). However, this general rule has no application when the map or plat is not prepared as a survey of the property and possesses none of the dignity or attributes or indicia of accuracy generally identified or associated with a survey of property. Gore, 200 So.2d at 51. Therefore, this rule also provides little guidance in our case, because the map *729 attached to the partition is a rough sketch with a fair degree of accuracy, but not precise enough to answer the question of which “public road” was meant in the partition.
The cardinal rule to be followed in construing a title document that is uncertain because of ambiguity, is to ascertain the intention of the parties from the entire language of the document. The intentions of the parties must be gathered from an inspection of the instrument itself, without the aid of extrinsic evidence, if possible. If the description is so ambiguous as to leave doubt as to the parties’ intent, the court may resort to extrinsic evidence as an aid in construction. Williams v. Hawthorne, 601 So.2d 672, 676 (La.App. 2nd Cir.1992). Looking first at the partition document itself, there is little to assist in determining the intent of the parties. As noted, there is only one line drawn on the map attached to the partition document, and only one “public road” is mentioned in the document. Yet, we know that two roads, one old and one new, existed when this document was executed. Therefore, we must look to extrinsic evidence as an aid in construction.
We note first that the documentary evidence establishes that the major portion of the “public road” referenced in the partition document had to be the old road, because this was an existing boundary for adjoining properties that could not be altered by the partition. By referring to only a singular “public road,” the major portion of | uwhich had to be the old road, it is logical to infer that the entire boundary line described as the “public road” refers to the old road. Had the parties meant otherwise, it seems the document would have differentiated between the two roads. To a limited extent, the partition map is helpful here, because it shows only a single, straight line as the “public road.” It does not depict a second roadbed or a jog to another roadbed along a portion of the boundary.
Second, we find persuasive evidence of intent in the parenthetical in Griffin’s chain of title that follows the words, “public road” with the words, “New Hope-Whitaker.” The parties have stipulated that the old road was known by this name. This clarification was added to the property description when Lot One was transferred by Leslie R. Spillman to his brother in 1955. True, this occurred fourteen years after the partition, but it is the first transfer of title to occur after the partition and it is a transfer from one of the original participants in the partition to another of the original participants. Obviously, Leslie R. Spillman and his brother believed the intent of the partition document they signed was to set the eastern boundary of Lot One at the centerline of the old road.
Third, we note that the parties to the partition were similarly imprecise with reference to another public road. The partition document states that Lot One is bounded on the west by “State Highway No. 258.” According to the evidence, State Highway No. 258 no longer carried that designation when the partition document was executed. It had also been reworked in the mid-1930’s and its new name was State Highway No. 421. Yet the text of the partition document and the attached map show this highway by its former name. This use of the historical name for the state highway supports the inference that the parties were also referring to the historical New Hope-Whitaker Springs Road when they used the words “public road” in the partition document.
Finally, we note that when transferring title to immovable property, it is customary to use exactly the same language as was used in the preceding transfer of the same property. This makes it clear that exactly the same property is being transferred. If any deviation in location is intended, the language is changed. In the 1^transfers of the Lot One property before the partition, the property description referred to State Highway No. 258 and the “public road” as two of the boundaries. In *730 the partition, the description of Lot One was not changed at all, but repeated that terminology. The continued use of these historical designations supports the inference that the parties meant to describe and convey the exact same property in the partition. This being so, the eastern boundary of Lot One should be the old public road.
Based on this evidence in the record, we conclude that Griffin met his burden of proof and established “better title” to the disputed property. Therefore, the judgment of the trial court must be reversed and judgment rendered declaring Griffin the owner of that property. Additionally, because the act of cash sale to the Daigles and the attached survey incorrectly show Morris Road as the western boundary of a portion of the Daigles’ property, these documents must be reformed to show the correct property description and must be recorded to clear the cloud on Griffin’s title.
CONCLUSION
For the foregoing reasons, the judgment of the trial court is reversed, and judgment is rendered in favor of Griffin, declaring the “public road” that forms the eastern boundary of his property is the center of the old roadbed, the New Hope-Whitaker Springs Road. This matter is remanded to the trial court so that a judgment may be rendered in conformity with this opinion, whereby the Daigles are ordered to reform their title documents to show the correct property description and to record the reformed documents to clear the cloud on Griffin’s title. All costs of this appeal are assessed against the Daigles.
REVERSED, RENDERED, AND REMANDED.

. Charles Griffin was the plaintiffs grandfather.

. Other evidence in the record indicates that this large tract contained approximately fifty acres.

. Apparently some of the property purchased by the Daigles was part of the fifty-acre tract north of Lot Two that Llewelyn Spillman already owned at the time of the partition.

. As previously noted, the parties stipulated and the court entered judgment that this matter was to be regarded as a petitory action. However, Griffin asked for a judgment declaring his ownership rights, and presented facts at trial suggestive of his possession of the property at issue. By stipulating that this matter is petitory in nature, he effectively abandoned his claims of possession, because the petitory action may only be brought by a party not in possession of the property. Had this stipulation not been entered, Griffin could have proceeded under an action for declaratory judgment and still maintained his claim of possession. See LSA-C.C.P. art. 3654; A.N. Yiannopoulos, Louisiana Civil Law Treatise: Property, § 261, at 516 (3rd ed. 1991); Liner v. Terrebonne Parish School Bd., 519 So.2d 777 (La.App. 1st Cir.1987), writ denied, 521 So.2d 1173(La.), cert. denied, 488 U.S. 827, 109 S.Ct. 79, 102 L.Ed.2d 55 (1988).

. In addition, a portion of the northern boundary of the fifty-acre tract that he already owned fronted State Highway 258.

. However, it could also have been treated as a boundary action or, as previously noted, as an action for declaratory judgment.