# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 17-711

## WILLIAM TERRY EBARB AND DEWANNA N. EBARB

## VERSUS

## THE UNOPENED SUCCESSION OF ALFAIR JONES SEPULVADO, ET AL.

## CONSOLIDATED WITH

## 17-712

## NORMAN MICHAEL SEPULVADO

## VERSUS

## WILLIAM TERRY EBARB, ET AL.

**********

APPEAL FROM THE
ELEVENTH JUDICIAL DISTRICT COURT
PARISH OF SABINE, NOS. 67,016 and 67,138
HONORABLE STEPHEN B. BEASLEY, DISTRICT JUDGE

**********

## VAN H. KYZAR
## JUDGE

**********

Court composed of Billy Howard Ezell, Van H. Kyzar, and Candyce G. Perret, Judges.

**AFFIRMED.**

**Charles W. Seaman**
**Seaman Law Firm**
**P.O. Box 835**
**Natchitoches, LA 71458-0835**
**(318) 352-7821**
**COUNSEL FOR PLAINTIFF/APPELLANT:**
    **Norman Michael Sepulvado**

**Ronald D. Brandon**
**Brandon Law Firm**
**P.O. Box 216**
**Many, LA 71449**
**(318) 256-5910**
**COUNSEL FOR DEFENDANTS/APPELLEES:**
    **William Terry Ebarb**
    **Dewanna N. Ebarb**

**Rebecca L. Riall**
**Riall Law Firm**
**P.O. Box 563**
**Zwolle, LA 71486**
**CURATOR FOR DEFENDANTS/APPELLEES:**
    **Unopened Succession of Alfair Jones Sepulvado**
    **Unopened Succession of Anthonita Sepulvado Wilkerson**
    **Unopened Succession of Williard W. Wilkerson**

**KYZAR, Judge.**

In these consolidated appeals, Norman Michael Sepulvado, Sr. (Michael) appeals the trial court judgment finding that he failed to prove ownership of nineteen acres of property by thirty-years acquisitive prescription. For the following reasons, we affirm the trial court's judgment.

## Discussion of the Record

This litigation began when William Terry Ebarb and his wife, Dewanna N. Ebarb ("the Ebarbs"), filed suit requesting that a nineteen-acre tract of land located in Sabine Parish, of which they owned an undivided interest, be partitioned by licitation. The suit named as defendants, the Unopened Succession of Alfair Jones Sepulvado, aka Alfor Jones Sepulvado, the Unopened Succession of Anthonita Sepulvado Wilkerson, and the Unopened Succession of Willard W. Wilkerson. After being appointed curator and succession representative of all three defendant unopened successions, the appointed attorney answered with a general denial as to the Successions of Willard Wilkerson and Alfair Sepulvado, but answered indicating that Michael, who had acquired the interests of the heirs of Anthonita Sepulvado, was the proper defendant to answer therefor. The Ebarbs then filed an amending petition naming Michael as a defendant to the partition suit in lieu of the Unopened Succession of Anthonita Sepulvado Wilkerson. Michael answered the suit and filed a reconventional demand, claiming ownership of the entire property by virtue of thirty-years acquisitive prescription. He also filed a separate petition for declaratory judgment making the same claim of ownership of the property by acquisitive prescription, in answer to which the Ebarbs filed a general denial. The two actions were consolidated for trial purposes by the trial court.

The tract of land at issue is described as follows:

A CERTAIN TRACT OF LAND, twenty-two (22) acres of land in the Southeast Quarter (SE 1/4) of the Southwest Quarter (SW 1/4) of Section 32, Township 8 North, Range 13 West Sabine Parish, Louisiana, more particularly described as beginning at a point 35 yards West of the Northeast corner of above described forty, then run West 240 yards, then South 440 yards to South line of forty; then run East 240 yards to line of land belonging to Paul Sepulvado; then run North 440 yards to place of beginning, containing 22 acres, more or less, with the improvements thereon, situated in Sabine Parish, Louisiana.

LESS AND EXCEPT
Beginning 996.2 feet South of the Northwest corner of the Southeast Quarter (SE 1/4) of the Southwest Quarter (SW 1/4) of Section 32, Township 8 North, Range 13 West, run thence East 520.5 feet to a stake set for corner, thence run North to the North right-of-way line of existing graded road (a distance of approximately 128 feet), thence East a distance of 375 feet, thence North 348.48 feet, thence West 375 feet, thence South along the East line of Johnny Ebarb property a distance of 348.48 feet to the place of beginning, together with all buildings and improvements situated on said tract of land, situated in Sabine Parish, Louisiana.

The total acreage being 19 acres, more or less.

Following a January 13, 2017 trial on the merits, the trial court held that Michael failed to prove that he had acquired the property by thirty-years acquisitive prescription. It then rendered judgment in favor of the Ebarbs, ordering that the property be partitioned by licitation. It is from the trial court's March 21, 2017 final judgment that Michael appeals, asserting the following assignments of error in the form of issues presented for review:

(1) What was the effect of the failure of the Ebarb's [sic] in their Answer filed in Docket Number 67,138 to not set forth an affirmative defense as mandated by LSA-CCP Article 1005.

(2) Did **NORMAN MICHAEL SEPUVLADO** acquire, by acquisitive prescription the ownership of the nineteen acres in controversy.

(3) Is the property susceptible of being partitioned in kind.

Based on the fact that Michael agrees that the property is not susceptible of being partitioned in kind, we need not address his third assignment of error.

## OPINION

The manifest error standard of review was recently reviewed by the supreme court in *Hayes Fund for First United Methodist Church of Welsh, LLC v. Kerr-McGee Rocky Mountain, LLC*, 14-2592, p. 8 (La. 12/8/15), 193 So.3d 1110, 1115-16, wherein the court stated:

> In all civil cases, the appropriate standard for appellate review of factual determinations is the manifest error-clearly wrong standard, which precludes the setting aside of a trial court's finding of fact unless that finding is clearly wrong in light of the record reviewed in its entirety. *Cenac v. Public Access Water Rights Ass'n*, 02-2660, p. 9 (La.6/27/03), 851 So.2d 1006, 1023. Thus, a reviewing court may not merely decide if it would have found the facts of the case differently. *Hall v. Folger Coffee Co.*, 03-1734, p. 9 (La.4/14/04), 874 So.2d 90, 98. Rather in reversing a trial court's factual conclusions with regard to causation, the appellate court must satisfy a two-step process based on the record as a whole: there must be no reasonable factual basis for the trial court's conclusion, and the finding must be clearly wrong. *Stobart v. State through Dept. of Transp. and Development*, 617 So.2d 880, 882 (La.1993).

> This test requires a reviewing court to do more than simply review the record for some evidence, which supports or controverts the trial court's findings. The court must review the entire record to determine whether the trial court's finding was clearly wrong or manifestly erroneous. *Parish Nat. Bank v. Ott*, 02-1562, pp. 7-8 (La.2/25/03), 841 So.2d 749, 753-54. The issue to be resolved on review is not whether the judge or jury was right or wrong, but whether the judge's or jury's factfinding conclusion was a reasonable one. *Rosell v. ESCO*, 549 So.2d 840, 844 (La.1989); *Canter v. Koehring Co.*, 283 So.2d 716, 724 (La.1973).

### *Affirmative Defenses*

In his first assignment of error, Michael asserts that the Ebarbs failed to plead an affirmative defense to his assertion of ownership by thirty-years acquisitive possession, in accordance with La.Code Civ.P. art. 1005. Thus, he claims that all defenses to his asserted possession of the property were essentially

waived, and he should have been declared the owner of the nineteen-acre tract of land. Louisiana Code of Civil Procedure Article 1005 provides as follows:

> The answer shall set forth affirmatively negligence, or fault of the plaintiff and others, duress, error or mistake, estoppel, extinguishment of the obligation in any manner, failure of consideration, fraud, illegality, injury by fellow servant, and any other matter constituting an affirmative defense. If a party has mistakenly designated an affirmative defense as a peremptory exception or as an incidental demand, or a peremptory exception as an affirmative defense, and if justice so requires, the court, on such terms as it may prescribe, shall treat the pleading as if there had been a proper designation.

In *Fin & Feather, LLC v. Plaquemines Parish Government*, 16-256, pp. 6-7 (La.App. 4 Cir. 9/28/16), 202 So.3d 1028, 1033 (alteration in original) the fourth circuit stated:

> "Louisiana jurisprudence defines an affirmative defense as a defense that 'raises a new matter, which assuming the allegations in the petition are true, constitutes a defense to the action.'" *Bienvenu v. Allstate Ins. Co.*, 01-2248, p. 5 (La.App. 4 Cir. 5/8/02), 819 So.2d 1077, 1080, quoting *Allvend, Inc. v. Payphone Commissions Co., Inc.*, 00-0661, p. 3 (La.App. 4 Cir. 5/23/01), 804 So.2d 27, 29. "Generally, an affirmative defense must be pleaded or it is waived." *Allvend*, 00-0661, p. 6, 804 So.2d at 30. However, "[i]mplicit in that definition is the conclusion that a defendant is not required to raise an issue as an affirmative defense if it does not raise a 'new matter.'" *Bienvenu*, 01-2248, p. 5, 819 So.2d at 1080. The purpose of requiring that affirmative defenses are pled "is 'to give fair notice of the nature of the defense and thereby prevent a last minute surprise.'" *Id.*, 01-2248, p. 6, 819 So.2d at 1080, quoting *Allvend*, 00-0661, p. 6, 804 So.2d at 30.

Michael asserts in brief that "[a]ffirmative defenses in this particular instance . . . would have been that the possession was not continuous, was not uninterrupted, was not peaceable, was not public and/or was not unequivocal[,]" citing La.Code Civ.P. art. 3476. We disagree.

In *Johnsa v. Edwards*, 582 So.2d 1280, 1283 (La.1991), the supreme court distinguished between affirmative defenses necessary to defeat a claim versus ordinary defenses:

4

We have concluded, in another context, that a defendant's attempt to defeat a plaintiff's action by disproving an essential element of the plaintiff's claim, where the attempt neither raised a new matter nor assumed the allegations in the petition to be true, is in reality a negative defense which seeks to refute an essential allegation of the plaintiff's petition. *Keller v. Amedeo*, 512 So.2d 385, 388 (La.1987). An affirmative defense, by contrast, raises new matters which, assuming the allegations in the petition to be true, constitute a defense to the action and will have the effect of defeating plaintiff's demand on its merits. *Keller*, 512 So.2d at 387; *Webster v. Rushing*, 316 So.2d 111, 114 (La.1975). Unlike, for example, the affirmative defenses of "discharge in bankruptcy", *see Rider v. Fontenot*, 463 So.2d 951, 956 (La.App. 3rd Cir.1985), or, in the criminal context, "justification," *see State v. Cheatwood*, 458 So.2d 907, 910, 910 n. 4 (La.1984), neither of which concern legal and factual questions raised by plaintiff's petition (or the state's indictment), but which instead raise another legally sufficient ground to defeat an action, Reliance's proffered testimony aims directly at an essential element of the purchasers' claim (causation) and, if believed by the fact-finder, could undermine and would refute that element of the purchasers' case.

In order to prove ownership of the property by thirty-years acquisitive prescription, Michael had the burden of proving that his possession of the property was continuous, uninterrupted, peaceable, and public or unequivocal. The defense of any of these elements is merely a negative defense, which does not involve raising new matters to defeat the claim. Thus, the Ebarbs' general denials of Michael's claims of possession, sufficient to acquire ownership by acquisitive prescription, were adequate.

Additionally, the failure to specifically plead an affirmative defense does not end the inquiry or support a verdict in favor of a plaintiff, who may or may not have proof sufficient to support his claim. The failure of the plaintiff to object to any evidence presented by the defendant, which should have been affirmatively pled, results in an expansion of the pleadings. The plaintiff must object to any evidence presented by the defense that should have been pled affirmatively in order to defeat the demands of the plaintiff.

> Our jurisprudence provides that even when an affirmative defense has not been pleaded by the defendant, if the plaintiff fails to object to the introduction of evidence that bears on the affirmative defense and that is not pertinent to any issues raised in the pleadings, the pleadings are considered to have been enlarged to include the affirmative defense, and the court can act as though the affirmative defense was pleaded. *DLJ of Louisiana No. 1 v. Green Thumb, Inc.*, 376 So.2d 121 (La.1979). Thus, even if we assume, *arguendo*, that Lombardino in the case at bar failed to properly plead the affirmative defense of extinguishment, despite specifically pleading the affirmative defenses of lack of consideration and work not completed in accordance with the agreement, we conclude that Audio Plus's failure to object to Lombardino's testimony regarding the nature of the contract and payments made thereon would enlarge the pleadings to include extinguishment.

*Audio Plus, Inc. v. Lombardino*, 47,488, p. 7 (La.App. 2 Cir. 9/20/12), 105 So.3d 725, 729.

Michael failed to object to any evidence offered by the Ebarbs, which should have been affirmatively pled; thus, he cannot complain about that evidence now on appeal. Accordingly, we conclude that this allegation of error lacks merit.

*Ownership*

In his second assignment of error, Michael argues that the trial court erred by finding that he failed to prove ownership of the property by thirty-years acquisitive prescription. He argues that he acquired title to the property by adverse possession commencing on January 8, 1979, when his aunt, Elverna Marie Sepulvado Sandifer, conveyed the entire tract of property to his mother, Emma. Michael asserts that from January 8, 1979, until Emma's donation to him on October 1, 2014, the property was used "exclusively, notoriously, and to the exclusion of everyone else," by either Emma or him and "without interruption of any kind."

> The petitory action is one brought by a person who claims the ownership, but who is not in possession, of immovable property, against another who is in possession or who claims the ownership thereof adversely, to obtain judgment recognizing the plaintiff's ownership. LSA-C.C.P. art. 3651; *Lafourche Realty Co., Inc. v.*

6

*Duard Eymard Co., Inc.*, 93-1278 (La.App. 1st Cir.6/24/94), 638 So.2d 1138, 1139, *writ denied*, 94-1991 (La.11/11/94), 644 So.2d 390. To obtain a judgment recognizing his ownership of immovable property, the plaintiff in a petitory action must: (1) prove that he acquired ownership from a previous owner or by acquisitive prescription, if the court finds that the defendant is in possession of the property; or (2) prove a better title thereto than the defendant, if the court finds that the latter is not in possession thereof. Therefore, the first issue that must be determined in a petitory action is the question of current possession. *Mt. Everett African Methodist Episcopal Church v. Carter*, 96-2591 (La.App. 1st Cir.12/29/97), 705 So.2d 1179, 1181. The defendant's possession, or lack of it, determines the burden of proof imposed on the plaintiff. *See* LSA-C.C.P. art. 3651, Official Revision Comments (a); *Joffrion v. Scioneaux*, 506 So.2d 512, 513-14 (La.App. 1st Cir.1986), *writ denied*, 505 So.2d 1132 (La.1987). When the titles of the parties are traced to a common author, he is presumed to be the previous owner. LSA-C.C.P. art. 3653; LSA-C.C. arts. 531 and 532.

*Griffen v. Daigle*, 99-1942, pp. 6-7 (La.App. 1 Cir. 9/22/00), 769 So.2d 720, 724-25, *writ denied*, 00-3406 (La. 2/2/01), 784 So.2d 648 (footnote omitted).

Although Michael asserted ownership through a petition for declaratory judgment, the trial court judgment stated that the parties stipulated that the petition for declaratory judgment would be considered a petitory action. Thus, Michael, through this stipulation, judicially confessed that the Ebarbs were in possession of the property and determined his burden of proof. Accordingly, Michael was required to prove at trial that "he acquired ownership from a previous owner or by acquisitive prescription." *Id.*

Acquisitive prescription is the "acquiring of ownership or other real rights by possession for a period of time." La. C.C. art. 3446. Ownership of immovable property by acquisitive prescription may be acquired by either ten years of possession, La. C.C. art. 3473, or thirty years of possession, La. C.C. art. 3486. To acquire ownership with ten years of possession, there must be possession for ten years, good faith, just title, and a thing susceptible of acquisition by prescription. La. C.C. art. 3475. To acquire ownership with thirty years of possession, the thing must be susceptible of acquisition by prescription, and there must be continuous, uninterrupted, peaceable, public, and unequivocal corporeal possession for thirty years. La. C.C. art. 3476; La. C.C. art. 3486; *Grieshaber Family Props., LLC v. Impatiens, Inc.*, 10-1216 (La. App. 4 Cir. 3/23/11), 63 So.3d 189, 195.

*Chauvin v. Shell Oil Co.*, 16-609, pp. 10-11 (La.App. 5 Cir. 10/25/17), 231 So.3d 903, 910, *writ denied*, 17-1985 (La. 1/29/18), __ So.3d __.

This court, in *Phillips v. Fisher*, 93-928 (La.App. 3 Cir. 3/2/94), 634 So.2d 1305, 1307, *writ denied*, 94-813 (La. 5/6/94), 637 So.2d 1056, stated:

> Immovable property may be acquired through thirty years acquisitive prescription without good faith or just title. La.C.C. art. 3486. The party asserting acquisitive prescription bears the burden of proving all the facts that are essential to support it. *Humble v. Dewey*, 215 So.2d 378 (La.App. 3 Cir.1968). A possessor will only be considered as possessing that part of property over which he exercises actual, adverse, corporeal possession which is continuous, uninterrupted, peaceable, public, unequivocal, and within visible bounds. La.C.C. art. 3476; *Suire v. Primeaux*, 363 So.2d 963 (La.App. 3 Cir.), *writ denied*, 365 So.2d 243 (La.1978); *Allen v. Martino*, 529 So.2d 90 (La.App. 1 Cir.1988). He must also prove that he intended to possess as owner, adverse to the actual owner, for the required thirty years. La.C.C. art. 3424.

The evidence presented at trial consisted of testimony by Mr. Ebarb and by Michael's wife, sister, brother, and cousin.

Mr. Ebarb testified that he owns 85% of the property at issue, based on calculations performed by his counsel, but that he was unsure of the percentage of property not owned by either him and his wife or Michael. He stated that he has lived three miles east of the property for thirty-nine years and that different persons have lived on the property during that time. Mr. Ebarb testified that Michael, who has lived on the property for several years, has a mobile home on the property. Previously, he stated that Cynthia Barnett lived there in an old house that was located on the property, and that Michael's great-grandparents, Tony and Angeline Sepulvado lived there. Mr. Ebarb testified that he purchased the property because he owns eighty acres, which adjoin the northwest side of the property.

Rosa Sepulvado, Michael's wife, testified that she and Michael have lived on the property continuously for sixteen years in a mobile home. She testified that Michael's great-grandparents, Tony and Angeline, lived on the property up until

8

1975, when they moved to Monroe. Thereafter, she stated that Michael's brother, Griffen, lived on the property from 1988 through 1995. Although no one lived on the property between 1975 and 1988, Rosa stated that Michael's mother, Emma Jean Sepulvado, and her immediate family utilized the property by paying the property taxes and electric and water bills for the property, and they put up Christmas lights, grew a garden, kept chickens and dogs, cut firewood, had four-wheeler trails, and hunted on the property. Rosa testified that Emma and her children would meet at the property and cook and eat there. She stated that Michael was given permission to live on the property by his mother, but she did not think that Emma asked any other family member for permission for Michael to live there. She said that Michael's aunts or uncles never voiced an opinion about him living on the property and that no other family members outside of Emma's family used the property. Rosa testified that in addition to living on the property, Michael posted the property from trespassing and would not let anyone on the property without his permission.

Emma testified that her mother, Anthonita, who died in 1986, was one of the owners of the property at issue. She stated that her grandparents, Tony and Angeline, last lived on the property in 1975. After they moved, she stated that she and her immediate family used the property exclusively since 1975. She stated that she took care of the property, took vegetables from the garden to her grandparents, and mowed the grass. She said that she also paid the electric and water bills and the property taxes. Emma testified that her children hunt on the property, and Michael cut firewood from the trees located on the property.

9

Emma, who had eight siblings and half-siblings,[1] testified that she did not ask permission of any of her aunts, uncles, or cousins for Michael to move onto the property. After he did so, she stated that she conveyed her entire interest in the property to him. She said that all of her five living siblings agreed that he could live on the property. However, she qualified her statement by stating that no one ever questioned him living on the property because he took care of it. Emma testified that although her family members knew Michael was living on the property, none of them ever said anything about him being on the property. She stated that it was the same when Griffen lived on the property between 1988 through 1995.

Emma testified that her cousin, Wilson J. Sepulvado, called her two years ago and told her that Michael needed to move from the property after he started having trouble with a neighbor. She stated that she told Wilson, "I've paid the taxes, and now y'all doing this to me and my family." Prior to that, she stated that she never discussed whether it was okay for Michael to live on the property. She said that she thought that because she paid the taxes on the property that it was okay for Michael to live there. Emma testified that she was so upset at Wilson that she did not tell Michael what had occurred. After this incident, she stated that she transferred her property into Michael's name.

Angela Sepulvado Martinez, Michael's sister, testified that Michael and Rosa moved onto the property approximately seventeen years ago. She stated that she lives three miles from the property and that she has visited Michael and Rosa there. She stated that the only persons who have lived on the property before Michael and Rosa were her brother Griffen and her great-grandparents, Tony and

---

[1] Her eight siblings and half-siblings are: Virginia Gail, Carol Sue, James Michael, Frank Anthony Cascio, Victor Joe Cascio, Cynthia Ann Barnett, Debbie Woodard, and Thomas Woodard.

Angeline. Angela testified that she was not aware of anyone else living on the property since 1975, and she stated that only her immediate family has used the property since that time.

Angela testified that her family keeps a garden on the property, that her mother pays the property taxes and water and electric bill, and they hunt and ride four-wheelers on the property. She said that she was not aware of any other heirs using the property and that she would have known had they been on the property. Angela testified that although she does not associate with her, she did not believe that Cynthia Barnett, Emma's sister, lived on the property. She further stated that she did not know if any other family member gave permission for Michael to live on the property.

Griffen, Michael's brother, testified that he lived on the property between 1988 and 1995, first in a mobile home and then in the house located on the property. He stated that after his great-grandparents moved from the property in 1975, his mother kept up the property. He said that no other family members, other than his immediate family, helped with the property and that he would have known if they had gone on the property.

Griffen testified that he moved on the property in 1988, after his 1987 divorce and that he did not ask permission of any family member before doing so. He stated that no other family member came onto the property during the seven years he lived there. Griffen testified that he used the property as though he owned it during that time. He stated that he and his family cut firewood, grew gardens, hunted, and used the property for recreational purposes. Griffen testified that although he knows Wilson Sepulvado, he does not talk to him. He said that he did not know if Wilson gave Michael permission to move onto the property, and he

11

was unware of the telephone conversation in which Wilson told Emma that Michael needed to move off the property.

Griffen testified that the property used by his family was where the family home was located, and it was intended for Anthonita. He stated that the map of the family property was numbered by blocks and that the block including the family home is the property at issue in this matter. He said that paperwork was drawn up by the family, but that it was never properly finalized. Griffen testified that his family never touched any of the property intended for other family members.

Timothy Woodrow Meshell, Michael's first cousin, testified that Emma and her family have used the property for years. He stated that he used to spend time on the property during the summers or weekends between the 1970s and up to 1980, when his grandmother, Anthonita, would visit the property. Mr. Meshell testified that Anthonita took care of the property until she died, after which Emma and her family took over caring for the property.

Mr. Meshell testified that his mother, Carol Sue Larue, who was Emma's sister, was probably still alive when Michael moved onto the property. He stated that he and his mother never discussed the issue of Michael living there. He said that he considered the property as family property, so it was not necessary for family members to seek permission before living on the property. Mr. Meshall testified that he would have granted Michael permission to live on the property had he asked him. He stated that Michael never informed him that he intended to live on the property. He said that he knew that Emma's children were on the property and that he was always welcome to visit while they lived there. Mr. Meshell testified that Michael has lived on the property since approximately 2000, but he did not recall Cynthia Barnett living on the property.

Mr. Meshell testified that he thought that the property would always be owned by their family and that this was what his mother and his grandmother would have wanted. He stated that he felt that he could have lived on the property if he wanted to do so. Mr. Meshall testified that he and his four sisters sold their interest in the property to the Ebarbs. He stated that his older sister arranged the sale and that he thought they were selling the property to Michael. He said that he never thought about whether he owned an interest in the property before selling to the Ebarbs. He said that he only learned that the property was sold to the Ebarbs when he received his check. Mr. Meshall testified that both he and his younger sister would not have sold their interest in the property had they known it was being sold out of the family.

Mr. Meshell testified that his grandmother, Anthonita, owned more of the family property after she bought out some of her siblings. He stated that he never knew how many acres were included in the property until a few years before, and he never knew what percentage of the property he owned. He further said that he and his sisters never received notice that their interest in the property was being taken by a family member.

The evidence introduced during the trial consisted of numerous property transactions, a Sepulvado family history, and a flow chart outlining the ownership of the property.

In granting judgment in favor of the Ebarbs, the trial court made the following finding of fact in its March 21, 2017 final judgment:

> Mr. Norman Michael Sepulvado cannot establish 30-years acquisitive prescription for the requisite years immediately preceding the year 2000 because his mother, Ms. Frances Emma Jean Ezernack Sepulvado, was not a co-owner who had commenced to possess the entire property for herself by overt and unambiguous acts sufficient to give notice to her co-owners pursuant to La.Civ.Code arts. 3439 and

13

3478, which is the only exception to the general rule that an owner in indivision cannot acquire by prescription the rights of his co-owners in the property held in common[.]

After reviewing the record in its entirety, we find that the trial court's judgment finding that Michael failed to prove ownership of the property by thirty-years acquisitive prescription was not manifestly erroneous. We first note that Michael misstates the evidence by stating that Elverna Marie Sepulvado Sandifer conveyed the entire tract to Emma on January 8, 1979.[2] A review of the deed in question reveals that Elverna only conveyed her undivided interest in the property to Emma, which based on the January 13, 1978 judgment of possession from Tony Sepulvado's succession, only consisted of an undivided one-eighth interest in the property.

Louisiana Civil Code Article 3478 provides:

A co-owner, or his universal successor, may commence to prescribe when he demonstrates by overt and unambiguous acts sufficient to give notice to his co-owner that he intends to possess the property for himself. The acquisition and recordation of a title from a person other than a co-owner thus may mark the commencement of prescription.

Any other precarious possessor, or his universal successor, may commence to prescribe when he gives actual notice to the person on whose behalf he is possessing that he intends to possess for himself.

In *Andras v. Thibodeaux*, 13-1906, pp. 5-6 (La.App. 1 Cir. 10/30/14), 157 So.3d 767, 770-71, *writ denied*, 15-928 (La. 10/30/15), 204 So.3d 179, the court stated with regard to thirty-years acquisitive prescription:

Ownership and other real rights in immovables may be acquired by the prescription of thirty years without need for just title or good faith. La. C.C. art. 3486. A precarious possessor, such as a lessee or a depositary, is presumed to possess for another although he may intend to possess for himself. La. C.C. art. 3438. It is the well-settled jurisprudence of this state that owners in indivision cannot acquire by

[2] We note that neither Michael's nor the Ebarbs' appeal briefs included references to specific page numbers in the record, as required by Uniform Rules—Courts of Appeal, Rules 2-12.4 and 2-12.5.

14

prescription the right of their co-owners in and to property held in common. *British Am. Oil Producing Co. v. Grizzaffi*, 135 So.2d 559, 564 (La.App. 1 Cir.1961). A co-owner, or his universal successor, may commence to prescribe when he demonstrates by overt and unambiguous acts sufficient to give notice to his co-owner that he intends to possess the property for himself. The acquisition and recordation of a title from a person other than a co-owner thus may mark the commencement of prescription. La. C.C. art. 3478.

Documents recorded in the public records that are translative of title, even if invalid, qualify as overt and unambiguous acts sufficient to put co-owners on notice of adverse possession. *See Succession of Seals*, 243 La. 1056, 150 So.2d 13 (1963). In *Succession of Seals*, the recordation of a warranty deed was found to be sufficient notice of adverse possession against co-owners. In *Towles v. Heirs of Morrison*, 428 So.2d 1029, 1032 (La.App. 1 Cir.1983), the court found that an act of partition was sufficient notice of adverse possession against co-owners. Where one co-owner goes into and continues possession by reason of a deed translative or a partition declarative of title, the co-owner's possession is regarded as hostile to any claim of his co-owner, rebutting the presumption of precarious possession. *Towles v. Heirs of Morrison*, 428 So.2d at 1031.

In the present case, none of the intervenors had title or any recorded document translative of title. Mere occupancy, use, payment of taxes, and similar acts of possession will not suffice to constitute notice of adverse possession to co-owners. *British Am. Oil Producing Co.*, 135 So.2d at 564; *Headrick v. Lee*, 471 So.2d 904, 909 (La.App. 2d Cir.1985). The burden rests on the co-owner claiming acquisitive prescription to prove not only that his possession was in fact adverse, but that knowledge of such contrary possession was made known to the other co-owners. *British Am. Oil Producing Co.*, 135 So.2d at 566-567.

In *Southern Natural Gas Co. v. Naquin*, 167 So.2d 434, 437-439 (La.App. 1 Cir.), *writ refused*, 246 La. 884, 168 So.2d 268 (1964), the court ruled that farming the land, cutting wood, trapping crawfish, paying taxes, and granting mineral leases was insufficient to constitute notice of adverse possession to co-owners. In *Headrick*, the court found that living on the property since 1910, fencing it, growing crops, raising cattle, and cutting timber was mere occupancy and use. *Headrick*, 471 So.2d at 907-909.

Thus, the January 8, 1979 deed, which was executed by a co-owner, rather than a non-owner, was insufficient to put all of the property's owners on notice that Emma intended to commence possessing the property for herself. Moreover, all of the alleged acts of ownership performed by Emma and her family were mere acts

of occupancy and use, rather than acts of ownership.  Accordingly, we affirm the trial court's judgment finding that Michael failed to prove ownership via thirty-years acquisitive prescription.

## DISPOSITION

Based on the foregoing reasons, the judgment of the trial court is affirmed, and the costs of this appeal are assessed to Norman Michael Sepulvado.

**AFFIRMED.**