JAMES F. McKAY III, Chief Judge.
I,This appeal arises out of a trespass action. Plaintiff, Spanish Lake Restoration, LLC (“Spanish Lake”), appeals the January 6, 2015 judgment, denying Spanish Lake’s motion for partial summary judgment and granting summary judgment in favor of defendant, Petrodome St. Gabriel II, LLC (“Petrodome”). For the reasons that follow, we affirm the denial of Spanish Lake’s motion for partial summary judgment, but reverse the granting of summary judgment in favor of Petro-dome.
*231 STATEMENT OF FACTS AND PROCEDURAL HISTORY
Spanish' Lake is currently the owner of certain surface rights on a parcel of land (“Section 12”) located in the former Lago Español Wetlands Mitigation Bank[1] in Iberville Parish. Petrodome holds a mineral lease on Section 12.
In February 1999, Lago Español, LLC (“Lago Español”),[2] the owner of both lathe surface and mineral rights on Section 12, entered into an Interagency Agreement with certain regulatory agencies (U.S. Army Corps.of Engineers, U.S. Fish-and Wildlife Service, U.S. Environmental Protection Agency, and the Louisiana Department of Wildlife and Fisheries) establishing the formation of the Lago Español Mitigation Bank. Pursuant to the Inter-agency Agreement, Lago Español was required to execute and enforce a Conservation Servitude on the lands contained within the mitigation bank.[3]
In March 1999, Lago Español established and recorded a Conservation Servitude on the property pursuant to La. R:S. 9:1271, et seq. (Louisiana Conservation Servitude Act).[4] In return for valuable consideration received, Lago Español agreed to place certain restrictions upon the use of the land. The Conservation Servitude provides that the. land use restrictions “are made for the benefit of the current and all subsequent owners of the Property, shall run with the land and be binding on all future owners or users of all or any portion of the Property.”
In 2006, Rio Bravo Entergy Partners, LLC (“Rio Bravo”) acquired a lease for the mineral rights on Section 12 from Lago Español. Rio Bravo later assigned the Section 12 Mineral Lease to AUS- ' TEX Exploration, Iric. '(“AUS-TEX”). |3AUS-TEX 'was granted a Wetlands Permit from the Ú.S. Army Corp of Engineers (“USACE”). The Wetlands Permit allowed AUS-TEX to board the pre-existing Section 12 unimproved north-south road and its intersection with the unimproved east-west road. AUS-TEX boarded the Section'12 roads and drilled a well on the adjacent property located in Section 13. After failing to produce oil or gas, ÁUS-TEX plugged and abandoned the well, removed the board road and assigned the *232 Section 12 Mineral Lease and the Wetlands Permit to Rio Bravo.
In 2009, pursuant to a Cash Sale Special Warranty Deed, Spanish Lake acquired the surface rights on Section 12. Lago Español reserved the mineral rights.
In September 2011, Rio Bravo assigned its rights under the 2006 Wetlands Permit and an interest in the Section 12 Minérál Lease to Petrodome. Thereafter, Petro-dome re-boarded the north-south road and drilled a well on Section 13. Petrodome later fortified the north-south and east-west roads with limestone and installed an aboveground pipeline in the form of a natural gas gathering line that runs from the Section 13 well pad across the surface of Section 12.
Spanish Lake filed the present action on April 30, 2013, alleging that Petrodome committed a trespass on its Section 12 property. Spanish Lake maintains that it first learned of Petrodome’s trespass in 2012 and, that despite proper demand, Pe-trodome refused to leave or comply with the requirements of the Conservation Servitude.
The petition asserts that Petrodome’s unlawful and unauthorized ’activities, i.e. the installation of the permatized roáds and the gathering line on Section 12, caused damage to the property. It is further alleged that Petrodome’s actions may have jeopardized Spanish Lake’s authority and ability to operate its wetlands |4mitigation bank and to fulfill its legal and/or contractual obligations under the permits, leases and other agreements associated with the ownership and operation of its" property as a wetlands mitigátion bank.
Petrodome filed a motion, for summary judgment arguing that its operations were explicitly authorized by the Section 12 Mineral Lease, the Wetlands Permit, and the Conservation Servitude. Spanish Lake opposed Petrodome’s motion for summary judgment and .filed a cross motion for partial summary judgment,.arguing that Petrodome’s actions violate the Conservation Servitude and constitute a trespass. Spanish Lake further argued that the Section 12 Mineral Lease is subordinate to the restrictive covenants of the preexisting Conservation .Servitude.
After hearing the matters on December 9, 2014, the trial court determined that Petrodome did not trespass on Spanish Lake’s' property. In reasons orally assigned,' the trial court stated: “Petro-dome’s complained of acts were authorized by the- 1999 interagency agreement, the 1999 conservation servitude, the 2006 Section 12 mineral lease, the wetlands permit issued by the United States Army Corps of Engineers, and the public records doctrine.” In accordance with this ruling, judgment was rendered on January 6, 2016, granting summary judgment in favor of Petrodome, dismissing Spanish Lake’s action, and denying Spanish Lake’s cross motion for partial summary judgment. Spanish Lake’s timely appeal followed.
STANDARD OF REVIEW
“A motion for summary judgment is a procedural device used when there is no genuine issue of material fact for all- or part of the relief prayed Tor by a litigant.” Samaha v. Rau, 2007-1726, p. 3 (La.2/26/08), 977 So.2d 880, 882 (citing Duncan v. U.S.A.A. Ins. Co., 2006-0363 p. 3 (La.11/29/06), 950 So.2d 544, 546), See La. C.C.P. art. 966. “A summary judgment is reviewed de novo, with the appellate court using the same criteria that govern the trial court’s determination of whether summary judgment is appropriate, ie., whether there is any genuine issue of material fact, and whether thé mov-ant is entitled to judgment as a matter of law.” Davis v. Canadian Nat. Ry. 2013- *233 2959, p. 1 (La.4/17/14), 137 So.3d 11, 13 (citing Samaha v. Rau, 2007-1726, pp. 3-4 (La.2/26/08), 977 So.2d 880, 882-83).
A motion' for summary judgment' is properly granted “if the pleadings,' depositions, answers to interrogatories, and admissions, together With the affidavits, if any, admitted for purposes of the motion for summary judgment, show that there is no genuine issue .as to material fact, and that mover is entitled to judgment as a matter of law.” La. C.C.P. art. 966(B)(2). “A fact is material if it potentially insures or precludes recovery, affects-a litigant’s ultimate success, or determines the outcome of the legal dispute.” Hines v. Garrett, 2004-0806, p. 1 (La.6/25/04), 876 So.2d 764, 765 (per curiam) (citing Smith v. Our Lady of the Lake Hosp., Inc., 93-2512, p. 27 (La.7/5/94), 639 So.2d 730, 751). “A genuine issue of material fact is one as to which reasonable persons could disagree; if reasonable persons could reach only one conclusion, there is no need for trial on that issue and summary judgment is appropriate.” Id., at p, 1, 876 So.2d at 765-66.
La. C.C.P. art. 966(C)(2) sets forth the burden of proof in summary judgment proceedings, providing:
The burden of proof remains with the movant. However, if the movant will not bear the burden of proof at trial on the matter that is before the court on the motion for summary judgment, the movant’s burden on the motion does not require him to negate all essential elements of the adverse party’s claim, action, or defense, but rather to point out to the court that there is an absence of factual support for one or more elements essential to the adverse party’s claim, action, or defense. Thereafter, if the adverse party fails to produce factual support | r,sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial, there is no genuine issue of material fact.
See also Schultz v. Guoth, 2012-0343 (La.1/19/11); 57 So.3d 1002, 1006.
DISCUSSION
“A trespass occurs when there is an unlawful physical invasion of the property or possession of another. A trespasser is one who goes upon the property of another without the other’s consent.” Bourquard v. L.O. Ausauma Enters., Inc., 2010-0323, p. 3 (La.App. 4 Cir. 11/17/10), 52 So.3d 248, 251 (citations omitted).
Spanish Lake submits that a trespass occurred, and argues in this appeal that the trial court erred in permitting 'the more expansive terms of the Mineral Lease to override the pre-existing and more restrictive land use covenants- contained in the previously recorded Conservation Servitude. Spanish Lake maintains that the Conservation Servitude only permits the right to engage in subsurface exploration arid development of minerals, not the right to engage in unqualified mineral extraction that impacts the surface, as provided by the Section 12 Mineral Lease.
Petrodome counters, arguing that the rights granted by the Section 12 Mineral Lease are consistent with the Conservation Servitude. Petrodome further argues that the installation of the limestone roads and the gathering line on Section 12 property is exactly the type of localized surface impact contemplated by the Conservation Servitude; thus, no trespass occurred. As explained below, we find that questions of material fact remain as to whether Petro-dome’s actions are consistent with the Conservation Servitude.
The restriction at issue in the Conservation Servitude is set forth in Section 4 of the document as follows:
*234 Subsurface Mineral Extraction. Lago Español reserves the right to-.explore for and develop subsurface minerals (with the |7exception of gravel, sand and salt), including oil, gas and geothermal energies and pressures from the Property, subject to the terms of required permits; Such subsurface exploration or development may be carried on only in such a manner and with the use of such methods- so that any impact on the surface of- the Property will not be greater than a limited, localized impact, and rio permanent destruction of any conservation values of the Property may occur without compensation for the loss of wetland value.
The Section 12 Mineral Lease allows for:
the use of the surface of the leased premises for all purposes incident to the exploration for the production and transportation of such oil and gas and a nonexclusive right of ingress and egress to and from the leased premises at all times for such purposes, including the right to construct, maintain, and use roads and pipelines thereon for operations hereunder.
Clearly, the Section 12 Mineral Lease grants more rights than does the Conservation Servitude. The 'lease places no land use restrictions incident to the exploration and production of minerals. However, the Conservation Servitude dictates that methods used in the exploration and development of minerals may riot have greater than a “limited, localized impact” on the surface, with “no permanent destruction of any conservation values of the property without compensation for the loss of wetland value.”'
The Conservation Servitude provides that the restrictions placed on the property “are made for the benefit of the current and all subsequent owners of the Property, shall run with the land and be binding on all future owners or users'of any portion of the Property.” Pursuant to La. R.S. 9:1273(C), the'Conservation-Servitude is unlimited in duration by its own terms and as a matter of law.
The .publically recorded Conservation Servitude predates the Section 12 Mineral Lease by seven-years. Thus, Petrodome was on notice of the Conservation Servitude, and the restrictions it placed on the land, when the Section 12 Mineral Lease was assigned. Pursuant to the public records doctrine, as set forth in-La. |RC.C. art. 3338,-persons are held to have constructive notice of the existence and contents of recorded instruments, affecting -immovable property. See Mooring Tax Asset Group, LLC v. James, 2014-0109, p. 13 (La.12/9/14), 156 So.3d 1143, 1151.
In support of its case for trespass, Spanish Lake presented the affidavit of Scott Nesbit, wetlands ecologist and president of a specialized wetlands consulting firm. Mr. Nesbit is also the founder and owner of Conservation and Land Management, LLC (“CLM”). CLM is a co-owner and managing partner of Spanish Lake. As Chief Technical Officer for CLM, Mr. Nes-bit is responsible for maintaining Spanish Lake’s wetland regulatory compliance "with the USACE, enforcing the Conservation Servitude, and fulfilling the obligations to protect the-mitigation bank property. Mr. Nesbit states in his affidavit -that: 1) the pipeline created a “ground disturbance and destroyed vegetation” on the surface; and 2) the north-south road constructed by Pe-trodome created a “man-made hydrologic barrier” on the property.
Spanish Lake also introduced the affidavit of Stephen Wallace, ■ professional engineer and Chief Executive Officer of CLM. Therein, Mr. Wallace stated that: 1) no pipeline or permatized north-south road existed when Spanish Lake purchased the property; 2) Petrodome was-not granted *235 permission to permatize the road or install the pipeline; 3) the Interagency Agreement does not authorize the building-up/permatizing of unimproved dirt roads[5]; and 4) the pipeline created a ground disturbance and destroyed vegetation on the surface of the property.
As previously stated, in connection with subsurface exploration or development of minerals, the Conservation Servitude allows for only a limited, ] (¡localized impact on the surface of the property, and it allows for destruction of the conservation values of the property with compensation for the loss of wetland value (Emphasis added). It is undisputed that an impact to the surface of the Section 12 property occurred. However, based on our de novo review of the record, we find questions of fact as to whether the installation of the aboveground pipeline and the permatized limestone roads is consistent with the Conservation Servitude and the long term objectives of the Mitigation Bank. In other words, material issues of material fact remain as to whether the methods used by Petrodome exceeded the limited, localized surface impact contemplated by the Conservation Servitude.
We also find questions of fact as to whether Petrodome provided proper compensation for the loss of wetlands, values as required by the Conservation Servitude and the Interagency Agreement. Regarding the purchase of mitigation credits, Section VIII of the Interagency Agreement provides,. in pertinent part:
If a- decision is made to authorize activities in any portion of the Lago Espa-ñol Wetland Mitigation Bank, and such activities affect the quantity or quality of wetlands or functioning of the bank, the permit recipient will be required to compensate for the loss- of wetland value associated with his project. The amount of compensation required will be based upon the acreage of wetlands- impacted and the ultimate anticipated value of the impacted wetlands. Impacts to wetlands within the Lago Español Mitigation Bank shall be mitigated by debiting the appropriate credits from the mitigation area, if sufficient, credits are available. In cases where sufficient credits are not available, the per-mittee will be responsible for fulfilling all or part of his compensatory mitigation requirements elsewhere, as approved by NOD[6] (Emphasis added).
Here, Petrodome' purchased mitigation credits from the Bayoú Paul Mitigation Bank, which is not associated with .the Lago Español Mitigation Bank. ImSpanish Lake argues that the Interagency Agreement required Petrodome to purchase those credits from the Lago Español Mitigation Bank, ie., from the mitigation area where the wetlands property was impacted.
The record before us fails to provide sufficient information regarding the circumstances surrounding the purchase of mitigation credits for Petrodome’s project. The attorney for Petrodome stated on the record that “there was an issue with being able to get the credits from Lago Español, and they had to go offsite to Bayou Paul to get those credits.” The attorney acknowledged, however, that he did not have any documentation on that issue. Thus, it is not clear whether sufficient credits were available from the, Lago, Español Mitigation Bank. Because the record lacks this *236 documentation, it cannot be determined whether Petrodome adhered to the requirements of the Interagency Agreement when it purchased mitigation credits from the Bayou Paul Mitigation Bank., Consequently, material questions of fact remain on this issue.
DECREE
Considering the evidence in the record, we conclude that Petrodome failed to satisfy its burden of establishing the absence of a genuine issue of material fact with respect to Spanish Lake’s trespass claim. Therefore, we reverse the granting of summary judgment in favor of Petrodome. In all other respects, the trial court’s judgment is affirmed. This matter is remanded to the trial, court for further proceedings consistent with this opinion.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED

. “Wetland mitigation banking” is a type of service industry that supplies established wetlands and their associated values that developers may purchase to fulfill the compensatory mitigation requirements pf a permit. A wetland created or restored is the "bank.” Its ecological values are quantified into "credits” that' the developer purchases from the bank.
Comment, Wetlands Mitigation and Mitigation Banking in Louisiana, 59 La. L.Rev. 591, 592-597 (Winter, 1999).

. Lago Español is not a party to this litigation.

. The Interagency Agreement provides that "[t]he purpose of the Lago Español Wetland Mitigation Bank is to enhance and/or preserve productive bottomland hardwood and cypress-tupelo forested wetland ecosystems on approximately 4,046-acres'of land in Ascension and Iberville Parishes as compensation for unavoidable losses of wetland functions and values as authorized by Department of the Army (DA) Section"-10 and/or 404 permits.’-’ , • i-

.La. R.S. 9:1272 defines Conservation servitude as:
a nonpossessory interest of a holder in immovable property imposing limitations or affirmative obligations the purpose of which include retaining or protecting natural, scenic, or open-space values of immovable property, assuring its availability for agricultural, forest, recreational, or open-space use, protecting natural resources, maintaining or enhancing air or water quality, or preserving the ' historical, archaeological, or cultural aspects of unim-. ■proved immovable properly.

. We note that the Interagency Agreement (which mandated the Conservation Servitude) allows for the maintenance of existing perma-tized roadways (Emphasis added).

. NOD refers to the U.S. Army Co,rps of Engineers, New Orleans District.