| | | |
|---|---|---|
| **1026 CONTI HOLDING, LLC** | * | **NO. 2021-CA-0417** |
| **VERSUS** | * | |
| | | **COURT OF APPEAL** |
| **1025 BIENVILLE, LLC** | * | **FOURTH CIRCUIT** |
| | * | |
| | | **STATE OF LOUISIANA** |

* * * * * * *

APPEAL FROM
CIVIL DISTRICT COURT, ORLEANS PARISH
NO. 2016-01438, DIVISION "M"
Honorable Paulette R. Irons, Judge
* * * * * *
**Judge Paula A. Brown**
* * * * * *

(Court composed of Chief Judge Terri F. Love, Judge Roland L. Belsome, Judge Paula A. Brown)

**LOVE, C. J. CONCURS IN PART; DISSENTS IN PART; AND ASSIGNS REASONS**

Leonard L. Levenson
Christian W. Helmke
Colleen Boyle Gannon
Donna R. Barrios
LEONARD L. LEVENSON & ASSOCIATES
650 Poydras Street
Suite 2750
New Orleans, LA 70130

Raymond B. Landry
John Fitzgerald Lee
MOLLERE FLANAGAN & LANDRY, L.L.C.
2341 Metairie Road
Metairie, LA 70001

     COUNSEL FOR PLAINTIFF/APPELLANT

Joseph M. Bruno
Donald D. Reichert
BRUNO & BRUNO, LLP
855 Baronne Street
New Orleans, LA 70113

     COUNSEL FOR DEFENDANT/APPELLEE

This appeal stems from a dispute between two French Quarter landowners involving a landlocked courtyard in Square 97, located in the Second District of Orleans Parish (hereinafter "Lot AA"). 1026 Conti Holding, LLC ("Conti Holding") appeals the district court's judgment recognizing 1025 Bienville, LLC ("Bienville") as the legal owner of Lot AA through acquisitive prescription. After consideration of the record before this Court and the applicable law, we affirm the district court's judgment.

## PROCEDURAL AND FACTUAL HISTORY

There have been three previous appeals decided by this Court regarding a predial servitude burdening the property in dispute, Lot AA. Currently at issue is the ownership of Lot AA. As depicted in the diagram below, Lot AA sits in Square 97 of the Second District of Orleans Parish and is bounded by North Rampart, Bienville, Burgundy, and Conti Streets. The Lots surrounding Lot AA are Lots A(1), 2, 3, 8, A, and B.



To put this case in the right context, it is important to provide a brief overview of the litigation involving Lot AA. As set forth in the prior appeals, on June 2, 2006, Conti Condominiums, LLC ("Conti") bought property located at 1026 Conti Street, New Orleans, Louisiana, referred to as Lot 3 in the Act of Sale, from Bruno Properties (hereinafter "Bruno"). The Act of Sale also included a right for Conti to use an adjoining ally and courtyard, which were allegedly owned by Bruno at the time. Later, Bruno sold Lots A(1), 2, 3, 8, A, B, and Lot AA (the courtyard) to Bienville. Conti and Bienville existed peacefully for several years, both using the alley and courtyard for parking and storing materials during construction until Bienville striped the courtyard for parking and prohibited Conti and all others from using it.

*Conti I*

Conti filed suit on December 23, 2009, seeking to enjoin Bienville from interfering with Conti's right to use the common alley and courtyard accessed and shared by both properties ("petition to enjoin"). Conti also filed a motion for

summary judgment, requesting the district court classify the type of servitude authorized in Conti's Act of Sale of its property. The district court granted summary judgment in favor of Conti, finding that a predial servitude for access, passage and parking existed in favor of Conti, the dominant estate. Bienville promptly appealed. On appellate review, this Court reversed the district court's judgment and found, in part, that a genuine issue of material fact existed as to whether the servitude included the right to park on Lot AA or on any portion of it. *1026 Conti Condominiums, LLC v. 1025 Bienville, LLC*, 11-1055, pp. 1-12 (La. App. 4 Cir. 2/8/12), 84 So.3d 778, 779-85 *("Conti I")*. This Court remanded the matter back to the district court for trial on the merits. Conti sought supervisory review with the Supreme Court, which was denied. *1026 Conti Condominiums, LLC. v. 1025 Bienville, LLC*, 12-0801 (La. 5/25/12), 90 So.3d 415.

*Conti II*

On remand, the case proceeded to a bench trial. Following trial, the district court, in a December 18, 2014 amended judgment, pertinently found that a predial servitude existed for access and passage only over and across Lot AA in favor of the dominant estate Conti, but denied Conti the right to park on Lot AA.[1] Conti appealed, and this Court affirmed the district court's judgment. *1026 Conti Condominiums, LLC v. 1025 Bienville, LLC*, 15-0301, p. 1-3 (La. App. 4 Cir. 12/23/15), 183 So.3d 724, 725-27 (*"Conti II"*). The *Conti II* Court, recognizing that Conti's Act of Sale contained a "vaguely worded servitude," found that the district court did not err in denying Conti's request for a servitude to park on

---

[1] Both parties filed a motion for new trial. The district court denied Conti's motion, granted Bienville's motion, and rendered an amended judgment, which set forth with specificity the relief granted.

3

Bienville's property. *Id* at p. 9, 183 So.3d at 730. Conti sought a writ of certiorari with the Louisiana Supreme Court, which was ultimately denied. *1026 Conti Condominiums, LLC v. 1025 Bienville, LLC*, 16-0144 (La. 3/14/16), 189 So.3d 1067.

<u>Conti III</u>

On March 17, 2016, Conti filed a motion in its underlying petition to enjoin against Bienville, seeking to enforce the amended judgment of *Conti II*. Conti alleged that Bienville's designation of the servitude had in essence diminished its use of the servitude. In response, Bienville filed a motion for court approval to designate the location of the servitude ("motion to designate"), seeking court approval of Bienville's proposed location of the servitude in accordance with La. C.C. art. 750.[2] Rather than proceeding on its own motion, Conti withdrew its motion and opposed Bienville's motion. Meanwhile, on February 12, 2016, the principals of Conti created a new entity, 1026 Conti Holding, LLC ("Conti Holding") which filed a separate suit – a petition for declaratory judgment of ownership and for an action of trespass ("petition for declaratory judgment of ownership") – against Bienville, claiming ownership of Lot AA.[3] Notwithstanding, on December 30, 2016, Conti Holding filed a motion for leave to file a petition for intervention ("petition for intervention") in Conti's pending petition to enjoin. Following trial, on June 27, 2019, the district court granted Bienville's motion to designate and denied Conti Holding's petition for intervention as untimely. Both Conti and Conti Holding appealed.

---

[2] La. C.C. art. 750 provides that "[i]f the title does not specify the location of the servitude, the owner of the servient estate shall designate the location."

[3] Conti Holding's petition for declaratory judgment is the subject of this appeal and will be discussed in more detail, *infra*.

4

On appeal, Conti argued, among other things, that the district court erred in designating the location of the servitude to a limited area. *1026 Conti Condominiums, LLC v. 1025 Bienville, LLC*, 19-0826, p. 3 (La. App. 4th Cir. 8/5/20), ___ So.3d ___, 2020 WL 4499644, at *2 (*"Conti III"*). The *Conti III* Court, in affirming the district court's judgment, rejected Conti's argument and concluded the district court did not err in accepting the expert testimony of Bienville's witness over Conti Holding's witness at trial. The *Conti III* Court also denied Conti Holding's petition for intervention in the matter as Conti Holding's underlying petition for declaratory judgment of ownership was pending in the district court. Conti and Conti Holding sought supervisory review with the Supreme Court, which were subsequently denied. *1026 Conti Condominiums, LLC v. 1025 Bienville, LLC*, 16-0144 (La. 3/14/16), 189 So.3d 1067.

*Present Case*

As previously noted, Conti Holding filed a petition for declaratory judgment of ownership against Bienville on February 12, 2016, alleging that it owned Lot AA. Conti Holding contended that Bruno never owned Lot AA; therefore, it did not have the legal right to sell Lot AA to Bienville. Specifically, Conti Holding alleged that John Albion Saxton ("Saxton") acquired Lot AA from Pitard-Saxton Hardware in a sale dated 1921. Saxton died, and his succession was opened in the 24th Judicial Court in 1947; however, Lot AA was not listed in any sworn descriptive lists or inventory at that time. On August 15, 2015, Conti Holding purchased the succession rights of Saxton's heirs for $100.00 and filed a sworn descriptive list that included Lot AA.[4] Conti Holding averred that it was placed in

_____

[4] La. C.C.P. art. 3396.18 states in part that "[b]efore the succession can be closed, a judgment of possession rendered, and the independent administrator discharged, there shall be filed an

possession of Lot AA through a judgment of possession in the succession suit dated August 19, 2015, and after the judgment was recorded in Orleans Parish, taxes for Lot AA were assessed in the name of Conti Holding. Thus, Conti Holding contends, it is the titleholder and owner of the property. Conti Holding further alleged that although Bienville owned other properties surrounding Lot AA, Bienville was using Lot AA in deprivation of Conti Holding's right of ownership.

On March 28, 2017, Bienville filed its answer to the petition, denying the allegations. On March 30, 2020, Bienville filed a first supplemental and amended answer to the petition and reconventional demand for declaratory judgment of ownership ("reconventional demand"), claiming that it acquired Lot AA via acquisitive prescription through the possession of its ancestors in title. Specifically, Bienville contended that from 1947 until 2000, various Holzer family members and companies – Bienville's ancestors in title – possessed Lot AA peacefully and to the exclusion of all others.

A two-day bench trial commenced on January 12 and January 13, 2021. On April 14, 2021, the district court issued its judgment and accompanying reasons for judgment, denying Conti Holding's petition for declaratory judgment of ownership and granting Bienville's reconventional demand. The district court found that Conti Holding had record title of Lot AA, but Bienville was the legal owner of the property through acquisitive prescription.

This timely suspensive appeal by Conti Holding followed.

## STANDARD OF REVIEW

A trial court's determination with regard to whether a party has possessed property sufficient to establish acquisitive prescription is

---

inventory or sworn detailed descriptive list of assets and liabilities of the estate verified by the independent administrator."

subject to the manifest error standard of review. *St. John Baptist Church of Phoenix v. Thomas*, 08-0687, p. 7 (La. App. 4 Cir. 12/3/08), 1 So.3d 618, 623. . . . When the trial court's factual findings are based on the credibility of witnesses, the court's decision to credit the testimony of certain witnesses must be afforded deference by the reviewing court. *Id.* (citing *Rosell v. ESCO*, 549 So.2d 840, 844 (La. 1989)).

*Grieshaber Fam. Properties, LLC v. Impatiens, Inc.*, 10-1216, p. 6 (La. App. 4 Cir. 3/23/11), 63 So.3d 189, 194.

## DISCUSSION

Conti Holding assigns as its sole assignment of error that the district court erred as a matter of law in finding that Bienville, a universal successor to the Holzer Entities, met its burden of proving that it acquired ownership of Lot AA through acquisitive prescription. Specifically, Conti Holding argues: (1) the district court was correct in concluding that Conti Holding proved record title of Lot AA; (2) Bienville's ancestors in title did not own Lot AA, but rather had a predial servitude right to use Lot AA; and (3) the district court failed to recognize that precarious possessors can never adversely possess immovable property. We will discuss each argument in turn.

### *Record Title of Lot AA*

The first issue presented before the district court was to determine who the record titleholder of Lot AA was. Based on the documentary evidence admitted at trial, Lot AA and the surrounding lots (Lots A(1), 2, 3, 8, A, and B) have been bought and sold numerous times. A timeline of the purchases is as follows:[5]

Pitard Family:
- On February 25, 1880, Mr. Gustave Pitard ("Pitard") bought Lot 8.

---

[5] Conti Holding offered, filed and introduced one hundred eighty-seven (187) unopposed authenticated and admitted exhibits consisting of the sale, mortgages, assessment rolls, sheriff deeds, tax bills and surveys of Square 97.

- On November 8, 1880, Pitard bought Lot B with "use of the yard [Lot AA] and alley."
- On May 28, 1885, Pitard bought Lot A "with the right to use in common with the Vendors and others, the alley and yard [Lot AA] . . . ."
- By 1918, Pitard had died, and his wife, Cecilia Maupay Pitard ("Widow Pitard") acquired ownership of Lots 8, A, B, and AA as his universal legatee. Pitard gained possession of Lot AA by 30 year acquisitive prescription.[6]

Pitard's Inc:
- In 1918, Widow Pitard sold all the property she owned in Square 97 to Pitard's Inc. The company formerly owned by her deceased husband and his business partner, Saxton.
- On January 7, 1919, Pitard's Inc. changed its name to Pitard-Saxton Hardware Company Inc.

Saxton Family:
- On January 19, 1921, Pitard-Saxton Hardware Company Inc. sold the property it owned in Square 97 to Saxton.
- In 1921, Saxton owned Lots 8, A, B, and AA.
- On March 11, 1930, Saxton granted a mortgage, encumbering Lots 8, A, and B.
- On March 29, 1934, the City of New Orleans instituted a tax sale against Saxton regarding Lot AA.
- On September 16, 1936, Saxton redeemed Lot AA for the year 1930 by paying $27.58.

Dumestre Family:
- In 1937 John Emile Dumestre ("Dumestre") instituted foreclosure proceedings against Saxton for Lots 8, A, and B.
- In 1938, the sheriff's deed conveying ownership in Lots 8, A, and B to Dumestre contained a servitude of use of Lot AA.

The Holzer Entities:
- In 1944, when Dumestre sold Lots 8, A, and B to John and Rudolph Holzer, it was with "use in common with other parties of the yard [Lot AA] and alley . . . ."
- In 1946, Saxton's widow opened his succession and Lot AA was not included in his estate inventory.
- On July 19, 1946, the Holzers sold lots 8, A, and B to Holzer Realty Company, Inc. ("Holzer Realty").
- On January 12, 1951, Holzer Realty acquired Lot 2 from an auction.
- On November 3, 1953, Holzer Realty acquired Lot A(1) from an auction.

---

[6] Since 1918, Lots 8, A and B were sold collectively.

- On June 20, 1966, Holzer Sheet Metal Works Inc. ("Holzer Sheet Metal") bought Lot 3 from William Rosenthal and Samuel Gainsburgh.

Bruno Properties:
- On January 7, 2000, Holzer Sheet Metal, Holzer Realty, and Orleans Steel Products Company Inc. ("the Holzer Entities") conveyed Lots A(1), 2, 3, 8, A, B, and AA to Bruno. The Act of Sale specified that Lot AA was acquired on July 19, 1946.

Conti and Bienville:
- On June 2, 2006, Bruno sold Lot 3 to Conti by a Cash Sale.
  On June 23, 2006, Bruno sold Lots A(1), 2, 8, A, and B and Lot AA to Bienville by a Cash Sale.

Conti Holding:
- In 2015, Conti Holding bought all of the rights to Saxton's succession, and was placed in possession of Lot AA at that time.

At trial, several witnesses testified regarding the record title of Lot AA.

Pertinently, Jean Norton, a retired attorney specializing in real estate, testified that she examined the titles for attorney Stephen Simone, who worked on the sale of lots in Square 97, between Bruno and Bienville. Ms. Norton relayed that she never provided Mr. Simone with the title opinion approving the title of Lot AA in the name of Bruno because a review of the record showed that there was no title transfer of Lot AA from Saxton after he redeemed it from tax sale in 1930.

Mr. Simone, the closing attorney who issued the title commitment to Bienville, testified that he retrieved the property description for the June 23, 2006 Cash Sale from Bruno's January 7, 2000 acquisition of property from the Holzer Entities. The property description in both acquisitions included Lot AA and indicated that Lot AA was acquired on July 19, 1946 by Holzer Realty.[7] Mr. Simone relayed that Ms. Norton, who conducted abstract title examinations for

---

[7] Louis Hartmann, Conti Holding's surveyor expert, testified that he compared the property description for Lot AA in the 1921 Act of Sale and 2000 Act of Sale from the Holzer Entities. He opined that the legal description of Lot AA in the January 7, 2000 Act of Sale is inconsistent with the actual legal description of the lot in metes and bounds.

him, provided him with the title opinion as to the validity of the title. He further testified that Lot AA was not included on Ms. Norton's title abstract, the request for authorization to issue policy, nor was it included on the commitment to issue title insurance from the June 23, 2006 Cash Sale to Bienville.

Robert O'Brien, the manager and Principal of Conti Holding, testified that he created Conti Holding for the sole purpose of purchasing the succession rights the Saxton heirs had in Lot AA, after reviewing an email from Ms. Norton during the litigation on the petition to enjoin. In the email, Ms. Norton wrote that Lot AA was never recorded out of Saxton's name. Mr. O'Brien said he located one of Saxton's heirs and eventually purchased the heirs' interest in Saxton's succession for $100. He further testified that after he was placed in possession of Lot AA, city taxes on Lot AA were assessed in the name of Conti Holding, and Conti Holding paid the taxes.

The district court, after hearing the testimony of the witnesses and reviewing documentary evidence, found there were no transfers of Lot AA from the Saxton Succession until Conti Holding filed the judgment of possession in 2015. Thus, we agree that the district court correctly concluded Conti Holding proved good record title of Lot AA by virtue of an unbroken chain of title.

### Lot AA Predial Servitude

Conti Holding argues that the Holzer Entities, Bienville's ancestors in title, had only a servitude right to use Lot AA because it owned Lots 8, A, B, (A)1, 2, and 3 – the lots surrounding Lot AA. Conti Holding asserts that when the Holzer Entities acquired Lots 8, A and B in 1944, Lot (A)1 in 1953, Lot 2 in 1951 and Lot 3 in 1966, each conveyance instrument expressly granted a right to use the courtyard (Lot AA) and alley. Bienville counters that if the Holzer Entities had a

10

servitude, which it denies, the servitude was either extinguished by confusion or prescribed based on non-use.

*Applicable Law*

The laws governing predial servitudes are codified in the Louisiana Civil Code Articles 646 through 822. A predial servitude is defined as "a charge on a servient estate for the benefit of a dominant estate." La. C.C. art. 646. "The two estates must belong to different owners." *Id.* "Predial servitudes may be established by an owner on his estate or acquired for its benefit." La. C.C art. 697. "The use and extent of such servitudes are regulated by the title by which they are created . . . ." *Id.* "Predial servitudes are established on, or for the benefit of, distinct corporeal immovables." La. C.C. art. 698. "Predial servitudes may be natural, legal, and voluntary or conventional." La. C.C. art. 654. "[V]oluntary or conventional servitudes are established by juridical act, prescription, or destination of the owner." *Id.* "A predial servitude is inseparable from the dominant estate and passes with it." La. C.C. art. 650. Moreover, "[t]he right of using the servitude cannot be alienated, leased, or encumbered separately from the dominant estate," and the "servitude continues as a charge on the servient estate when ownership changes." *Id.*

"The establishment of a predial servitude by title is an alienation of a part of the property to which the laws governing alienation of immovables apply." La. C.C. art. 708. "Predial servitudes are established by all acts by which immovables may be transferred." La. C.C. art. 722. "Delivery of the act of transfer or use of the right by the owner of the dominant estate constitutes tradition." *Id.* "A transfer of immovable property must be made by authentic act or by act under private signature." La. C.C. art. 1839. "An instrument involving immovable property

shall have effect against third persons only from the time it is filed for registry in the parish where the property is located." *Id*. "A predial servitude is extinguished when the dominant and the servient estates are acquired in their entirety by the same person." La. C.C. art. 765.

*Analysis*

The evidence adduced at trial shows that in 1921, Saxton owned Lots 8, A, B, and AA. In 1930, Saxton encumbered Lots 8, A and B with a mortgage. A few years later, in 1934, the City of New Orleans instituted a tax sale on Lot AA against Saxton for unpaid taxes in 1930, which he redeemed in 1936. In early 1937, Dumestre instituted foreclosure proceedings against Saxton in regards to Lots 8, A, and B. By December 1937, the Sheriff seized Lots 8, A, and B, and on March 3, 1938, the sheriff's deed, per a writ of *fieri facias*, conveyed interest of Lots 8, A, and B to Dumestre. On February 23, 1944, Dumestre sold Lots 8, A, and B to the Holzer Entities, who, in turn, later sold the property to Bruno.

Kenneth Kulik, Conti Holding's title abstractor expert, testified that the language in the sheriff's deed from Dumestre's purchase of Lots 8, A, and B established a servitude over Lot AA. Specifically, the following exchange occurred between Mr. Kulik and counsel for Conti Holding:

> **Q.** I will conclude these questions by making sure I understand that what we talked about Lot AA and you testified the common ancestor was John Albion Saxton to the extent both parties have any ancestors. When we look at 8, A, and B we see for the entirety the Holzer [Entities]'s ownership Lots 8, A, and B have the right to use the yard and the common alley. Was that your testimony?
>
> **A.** Correct.
>
> **Q.** [Lot] A1 entirety of the Holzer [Entities]'s ownership from [19]53 to 2000 [Lot] Al had the right to use Lot AA. Is that correct?

12

**A.** That's correct.

**Q.** And Lot 2 from [19]51 to 2000 same question Lot 2 had the right to use?

**A.** Correct.

**Q.** Finally Lot 3 from [19]21 which predated the Holzer [Entities]'s ownership the same legal description occurred through 2000 that Lot 3 had the right to use?

**A.** Correct.

Mr. Kulik further testified that the lots the Holzer Entities acquired were all dominant estates to Lot AA's servient estate.

Bienville contends that as late as 1921, Saxton owned Lots 8, A, B and AA, and a servitude could not have been revived in 1944 when Dumestre sold Lots 8, A, and B to the Holzer Entities, because Dumestre did not own Lot AA. As such, Bienville maintains that Dumestre could not have granted a servitude for its use. We disagree.

Under our jurisprudence, "persons are held to have constructive notice of the existence and contents of recorded instruments affecting immovable property." *Spanish Lake Restoration, L.L.C. v. Petrodome St. Gabriel II, LLC*, 15-0451, p. 8 (La. App. 4 Cir. 1/13/16), 186 So.3d 230, 234 (citing *Mooring Tax Asset Group, LLC v. James*, 14-0109, p. 13 (La. 12/9/14), 156 So.3d 1143, 1151). *See also* La. C.C. art. 3338.[8] "It is frequently said that a purchaser of an immovable with a recorded predial servitude in its favor is entitled to rely on the public records." 4 Ronald J. Scalise Jr. & A.N. Yiannopoulos, Louisiana Civil Law Treatise: Predial Servitudes § 6:24 (4th ed. 2021).

---

[8] Pursuant to La. C.C. art. 3338, an instrument that transfers or establishes a real right over immovable property is without effect against a third party unless the instrument is recorded in the mortgage or conveyance records.

After review of the record, it is clear that a servitude over Lot AA was in existence as early as 1880, but the servitude was extinguished by confusion when Pitard acquired ownership of Lots 8, A, B, and Lot AA through thirty-year acquisitive prescription. Likewise, when Widow Pitard sold Lots 8, A, B, and AA in Square 97 to Pitard's Inc., that, in turn, sold the property to Saxton in 1921, there was no servitude encumbering Lot AA. After Saxton defaulted on the mortgage encumbering Lots 8, A, and B, Dumestre purchased the lots at a sheriff's sale in 1938, and became the owner of dominant estates with a servitude of use over Lot AA. The Act of Sale from Dumestre to the Holzer Entities, which was recorded in the conveyance records and conveyed a servitude over Lot AA, served as constructive notice to the Holzer Entities that the lots Dumestre conveyed contained a use of a servitude. In addition, the sheriff's deed conveying Lots 8, A, and B to Dumestre, which was also recorded in the conveyance records, served as constructive notice to the Holzer Entities that there was an existing servitude in favor of Lots 8, A, and B. As a servitude can be established by all acts that immovable property may be transferred, when Lots 8, A, and B were transferred from Saxton to Dumestre in 1938, a servitude over Lot AA was re-established in the Act of Sale.

Accordingly, we conclude the servitude over Lot AA was extinguished by confusion in 1910 when Pitard acquired ownership of Lot AA through acquisitive prescription, but was re-established in the 1938 sheriff's sale to Dumestre. This argument has merit.

Bienville also argues that if the servitude over Lot AA was not extinguished by confusion, then it was extinguished by the prescription of nonuse. Pursuant to La. C.C. art. 753, "[a] predial servitude is extinguished by nonuse for ten years."

14

"Prescription of nonuse begins to run for affirmative servitudes from the date of their last use . . ." La. C.C. art. 754.[9]  Review of the record shows that representatives from both the Holzer Entities and Bruno – the owners of Lots 8, A, and B after Dumestre – testified of their daily and exclusive use of Lot AA and the alley.  As such, we find that the servitude over Lot AA in favor of Lots 8, A, and B was not extinguished by the prescription of nonuse.

## Acquisitive Prescription

Conti Holding argues that Bienville, through its ancestors in title, did not acquire Lot AA through acquisitive prescription because Bienville's ancestors in title were precarious possessors.  Conti Holding insists that as precarious possessors, Bienville and its ancestors in title could not legally prescribe on the property, and, if they could, they lacked the requisite adverse possession to commence prescription.

In contrast, Bienville contends that its ancestors in title had peaceful, public, continuous, uninterrupted and unequivocal possession of Lot AA in Square 97 for more than thirty years, thus acquiring Lot AA through acquisitive prescription. Bienville further argues that the Holzer Entities were never precarious possessors of Lot AA, but even if they were, they rebutted the presumption of precariousness to begin adverse possession by giving actual notice of their intent to possess for themselves.

### Applicable Law

"Ownership is the right that confers on a person direct, immediate and exclusive authority over a thing." La. C.C. art. 477.  "The owner of a thing may

---

[9] La. C.C. art. 706 states that "[a]ffirmative servitudes are those that give the right to the owner of the dominant estate to do a certain thing on the servient estate. Such are the servitudes of right of way, drain, and support."

use, enjoy, and dispose of it within the limits and under the conditions established by law." *Id.* A "petitory action is one brought by a person who claims the ownership, but who is not in possession, of immovable property or of a real right therein, against another who is in possession or who claims the ownership thereof adversely, to obtain judgment recognizing the plaintiff's ownership." La. C.C.P art. 3651. To obtain a judgment recognizing his ownership of immovable property, La. C.C.P. art. 3653 requires the plaintiff to prove:

> (1) That he has acquired ownership from a previous owner or by acquisitive prescription, if the court finds that the defendant is in possession thereof, or
>
> (2) That he has proved better title thereto than the defendant, if the court finds that the defendant is not in possession thereof.

"The defendant in the petitory action is in possession when he and his ancestors in title have had corporeal possession for at least one year or civil possession for the same period of time preceded by corporeal possession." 2 A.N. Yiannopoulos, Louisiana Civil Law Treatise: Property § 11:10 (5th ed. 2021). "Corporeal possession is the exercise of physical acts of use, detention, or enjoyment over a thing." La. C.C art. 3425. Once acquired, even if the possessor ceases to possess corporeally, civil possession "is retained by the intent to possess as owner even if the possessor ceases to possess corporeally." La. C.C. art 3431. "One is presumed to intend to possess as owner unless he began to possess in the name of and for another." La. C.C. art. 3427. Possession over a thing is precarious when it is exercised with the permission of or on behalf of the owner or possessor. *See* La. C.C. art. 3437. La. C.C. art. 3437, cmt. (b) explains:

> According to civilian tradition and modern civil codes, there is a clear distinction between possession and detention. Possession is the exercise of physical acts of use, enjoyment, or detention over a thing with the intent to own it; detention or precarious possession is the

exercise of factual authority over a thing with the permission of or on behalf of the owner or possessor. The precarious possessor (called in France *possesseur precaire* or *detenteur*) does *not* intend to own the thing he detains (internal citations omitted).

"A precarious possessor . . . is presumed to possess for another although he may intend to possess for himself. La. C.C. art. 3438. As such, "[a]cquisitive prescription does not run in favor of a precarious possessor or his universal successor." La. C.C. art. 3477. However, a "precarious possessor, or his universal successor, commences to possess for himself when he gives actual notice of this intent to the person on whose behalf he is possessing." A precarious possessor gives notice and manifests intent to possess as owner by taking overt and unambiguous steps. *See* La. C.C. art. 3439 cmt. (b). "In such a case, there is a usurpation of possession." *Id.*[10] Notably "the words 'actual notice' have not been defined in the Civil Code. . . ." 2 Ronald J. Scalise Jr. & A.N. Yiannopoulos, Louisiana Civil Law Treatise: Property § 12:22, (5th ed. 2021).

"Ownership is lost when acquisitive prescription accrues in favor of an adverse possessor. La. C.C. art. 481. Thus, "[o]ne who claims the ownership of an immovable against another in possession must prove that he has acquired ownership from a previous owner or by acquisitive prescription." La. C.C. art. 531. "Ownership of immovable property may be acquired through a ten-year or thirty-year prescriptive period." *Grieshaber*, 10-1216, p. 7, 63 So.3d at 194-95 (citing La. Civ. Code arts. 3473 *et seq)*. "A possessor of immovable property without just title is considered a bad-faith possessor and is therefore subject to the thirty-year

---

[10] La. C.C. art. 3478, cmt. (b), also states, in pertinent part:

    ****

Louisiana courts have interpreted this provision expansively and have held that a precarious possessor may change the nature of his possession by his own overt and unambiguous acts that are sufficient to give notice to the owner. (internal citations omitted).

prescriptive period." *Id*. (citing La. Civ. Code art. 3486). "To establish acquisitive prescription, the bad-faith possessor must demonstrate *continuous, uninterrupted,* peaceable, public and *unequivocal* corporeal possession for thirty years." *Id*. (citing La. Civ. Code art. 3476)(emphasis in original). "Additionally, it is well-settled in Louisiana that the party claiming title to a tract of land by acquisitive prescription bears the burden of proof." *Id*. (citing *McKoin v. Harper,* 36,533, p. 3 (La. App. 2 Cir. 1/31/03), 836 So.2d 1260, 1263).

Having found that there was a servitude over Lot AA in favor of Lots 8, A, and B, we conclude that Bienville's ancestors in title were precarious possessors of Lot AA. Notwithstanding, this Court must next determine whether Bienville's ancestors in title gave sufficient notice to Saxton that it terminated its precarious possession with the intent to possess Lot AA for itself, and if so, whether it acquired Lot AA through acquisitive prescription.

*Trial Testimony*

The evidence presented at trial established that between 1946 and 1966 the Holzer Entities acquired Lots 8, A, B, A(1), 2, and 3 in Square 97.[11] Rudolph Holzer, III ("Mr. Holzer"), the former President of the Holzer Entities, testified that his family owned the Holzer Entities, which was comprised of three different companies – Holzer Sheet Metal Works, Inc., Holzer Realty Company, Inc. and Orleans Steel Products Company, Inc. Mr. Holzer began working at Orleans Steel Products in the summer of 1966, and he worked there from 1966 until 2000, when the Holzer Entities sold its property in Square 97 to Bruno. Mr. Holzer testified that Lot AA was where his family conducted their businesses – his family parked

---

[11] The Holzer Entities also owned Lot R, the undesignated lot next to Lot R, Lot F, the undesignated lot next to lot F, Lot M, Lot G and Lot H in Square 97.

their trucks on Lot AA, maintained a gas tank, a gas pump and stored other possessions on Lot AA. He said their customers used the common alley to pick up and drop off, and no one other than his family was allowed to use the lot. Mr. Holzer said Lot 3 (1026 Conti Street) housed a brothel, and before his family purchased Lot 3, the previous owners would attempt to park vehicles on Lot AA and enter their property through a back door, but his family "would run them off." He recalled times when he and his family arrived at work in the mornings, and their trucks were blocked because people had parked vehicles in the alley or on the lot. Mr. Holzer said his family would either have the vehicles towed or push the vehicles into the street. Eventually, his family erected a gate at the back of the alley to prevent people from entering the lot. Mr. Holzer emphatically testified that the alley was one thing, but "the lot was [theirs]". Mr. Holzer confirmed that after his family purchased Lot 3 in 1966, the Holzer Entities not only had exclusive use of Lot AA, but no one other than his family used the common alley.

In addition, Mr. Holzer testified that his family paid taxes on Lot AA for over thirty years; and, because they paid taxes on the lot, they believed they owned the lot. Bienville refers to the Orleans Parish Assessor's records admitted into evidence, which shows from 1947 to 2000, city taxes for Lot AA were assessed in the name of Holzer Realty Company.[12] The records further show that the 1944 tax bill number ending in 41-25 for Lot AA and paid by Dumestre, is consistent with the last four digits of the 2006 tax bill number (2 06 1 041 25) for Lot AA that was paid by Bruno.

---

[12] The parties agree that the tax assessment records offered into evidence for Lot AA are unreadable for the year 1959 and were not able to be located for the years 1988, 1989, 1990, 1992 and 1993.

Marion Bruno, Managing Partner of Bruno Properties, testified that Bruno Properties had exclusive use of Lot AA from 2000, the year it purchased the property from the Holzer Entities, until 2006, the year it sold the properties to Bienville and Conti. Ms. Bruno also affirmed that Bruno was assessed and paid city property taxes on Lot AA from 2001 through 2006.

Vincent Marcello, the owner of 1025 Bienville, LLC, testified that he bought several lots from Bruno in 2006, including Lot AA. He said Mr. O'Brien, of Conti Holding, asked for permission to place a dumpster on Lot AA, which he allowed. Eventually, Mr. O'Brien wanted use of Lot AA and proceeded to file a lawsuit. Mr. Marcello relayed that he had continuous uninterrupted peaceful possession of Lot AA until Mr. O'Brien filed the lawsuit. Mr. Marcello said that Conti Holding would not have been able to put trucks on Lot AA without his permission. He relayed that he never asserted ownership of Lot AA because he assumed he acquired ownership of Lot AA when he purchased the package of properties from Bruno. Mr. Marcello testified that he understood there was a dispute of ownership of the property and that Conti Holding had recently acquired an ownership interest in Lot AA.

The district court, finding that Bienville had acquired Lot AA via acquisitive prescription, reasoned:

> The remaining question is whether Bienville proved that it acquired ownership through acquisitive prescription. The Court finds that Bienville is the legal owner of Lot AA via acquisitive prescription. Acquisitive prescription is valid without the need for just title or good faith via possession and prescription of thirty years. Louisiana Code of Civil Procedure art. 3486. Here, the evidence presented at trial showed that the Holzer Entities possessed Lot AA to the exclusion of all others between the years of 1947-2000. The Holzer Entities acquired ownership of Lot AA via acquisitive prescription of thirty years. Holzer then conveyed that interest to Bruno Properties, and Bruno Properties conveyed that interest to

Bieville [sic]. Holzer's successors in interest, Bienville, are the proper owners of Lot AA. Because Bienville owns the property, they are not trespassers.

*Analysis*

Louisiana courts have routinely found in favor of the property owners in determining whether precarious possessors have terminated their precariousness in order to commence acquisitive prescription. In *Boudreaux v. Cummings*, 14-1499 (La. 5/5/15), 167 So.3d 559, the Supreme Court granted certiorari to determine the narrow issue of whether a predial servitude was established by way of acquisitive prescription. Boudreaux filed suit against Cummings alleging that he adversely possessed a predial servitude giving a right of way for thirty years and thus, had gained ownership of the passage. Cummings asserted that Boudreaux was a precarious possessor and that acquisitive prescription never ran in Boudreaux's favor. Boudreaux, his family, and farmers used the right of way for years. At one point, Cummings' ancestor in title, Weil, asked Boudreaux to move the right of way, and Boudreaux agreed to do so. The district court found that precarious possession was irrelevant and that by way of acquisitive prescription, the Boudreaux estate had acquired a right of way over the Cummings estate. Cummings appealed. The appellate court affirmed the district court's judgment and found that Boudreaux was using the right of way as an owner, not a precarious possessor. On supervisory review, the Supreme Court, in finding that a predial servitude had not been established, explained:

> [t]he possessor must intend to possess as owner and must take corporeal possession of the thing. La. Civ. Code art. 3424. The possession must be uninterrupted and free of vices, *i.e.,* continuous, public, peaceable, and unequivocal. La. Civ. Code arts. 3435 and 3476. The possession must be *adverse;* it must be an *unauthorized* use that infringes on the ownership of the servient estate. (Emphasis

21

added). One who merely exercises a right has nothing to prescribe. *Id.*"

*Id.* at p. 7, 167 So. 3d at 563-64. The *Boudreaux* Court determined that Boudreaux was a precarious possessor of the property, as evidenced by Cummings asking him to move the gate and he acquiesced to the request. Boudreaux merely exercised his permissive right to use the passage. The Supreme Court concluded that there was no evidence that Boudreaux gave actual notice to Cummings that Boudreaux intended to change the nature of his possession. As a result, Boudreaux never terminated his precarious possession, which prevented the commencement of acquisitive prescription.

In *Grieshaber Family Properties, LLC v. Impatiens, Inc.*, 10-1216 (La. App. 4 Cir. 3/23/11), 63 So.3d 189, this Court addressed whether the ownership of a strip of land near the corner of Napoleon and St. Charles Avenue in New Orleans, was acquired by way of acquisitive prescription. The parties in *Grieshaber* stipulated that the Grieshaber Family Properties, LLC's successor, Loving Mother, LLC had "paid all of the real estate taxes assessed on the disputed property. The area of land in question [was] included in Loving Mother's title and [had] never been within the boundaries of Impatiens' title." *Id*. at p. 4, 63 So.3d at 192. The matter proceeded to a bench trial where the district court rendered judgment, declaring Loving Mother as the owner of the disputed property, and rejecting Impatiens' acquisitive prescription claim. The district court found that Impatiens could not acquire the property by acquisitive prescription because it did not demonstrate corporeal possession and the intent to possess as owner for thirty years. Impatiens appealed. On appeal, this Court, affirmed the district court's judgment, finding that Loving Mother owned the disputed strip of land and that

Impatiens and its ancestors in title were precarious possessors, thus, acquisitive prescription could not begin to run. The *Grieshaber* Court noted that a representative from Loving Mother testified at trial that no one was told to leave the property nor alerted of Impatiens' intent to possess the land as owner. This Court concluded that there was "no evidence that the possession changed from precarious or that the nature of the possession changed by acts sufficient to put Loving Mother on notice of such a change." *Id*. at 10, 63 So.3d at 197.[13]

Both parties cite *Delacroix Corp. v. Perez*, 98-2447, (La. App. 4 Cir. 11/8/00), 794 S.2d 862, as the seminal case for a servient estate owner seeking to prescribe on the dominant estate despite being a precarious possessor. In *Delacroix*, Plaintiff, Delacroix Corp. ("Delacroix") had undisputed recorded title to 109,567 acres of land, including the property at issue, situated in Plaquemines

---

[13] See also other Louisiana appellate courts cases that have found the precarious possessor did not give actual notice to the owner that he intended to possess for himself:

In *Satsuma Pentecostal Church v. Harris,* 563 So.2d 1247, 47-49 (La. Ct. App. 1st Cir. 1990), wherein a church claimed that it had possessed the property it stood on as owner since its acquisition. The district court found that the church was a precarious possessor of the property it stood on and used it with the permission of its owners. On appeal, the appellant court found the church did not begin to possess for itself until the church's representative objected to the owner of the property's proposed sale. The representative then notified the owner that the church claimed ownership of the property, and the church proceeded to file a possessory action.

In *Feazel v. Howard,* 511 So.2d 1306, 08-09 (Ct. App. 2nd Cir.), *writ denied,* 514 So.2d 456 (La. 1987), the appellate court found the precarious possessor did not give actual notice to the owner of the property that he intended to possess for himself. The precarious possessor admitted at trial that he never asserted his "ownership of the disputed tract of land because he believed himself to be the owner and found it unnecessary to assert his ownership thereof." *Id.* at 1309. The Second Circuit found that this was insufficient to give actual notice to the owner, and thus, precarious possession never terminated, and acquisitive prescription never commenced.

In *Robin v. Finley,* 597 So.2d 178, 179-180 (La. Ct. App. 3rd Cir. 1992), Tony Robin and Robert Angelle came to an oral personal servitude agreement. After both parties died, Angelle's wife allowed Robin's heirs to continue to use the property. After her death, Angelle's heirs attempted to evict Robin's heirs from the property. The Robin heirs insisted that they had acquired ownership of the property through thirty-year acquisitive prescription. The district court found that the Robin heirs were precarious possessors, and could not acquire the property by acquisitive prescription. The Third Circuit affirmed the district court, finding that the Robin heirs did not give sufficient actual notice to begin acquisitive prescription until they filed a possessory action.

Parish. The land included the Stella Tract and the Scarsdale Tract. In 1951, Defendant, Chalin O. Perez ("Perez"), purchased 100 acres of the Stella Tract from Delacroix and in 1953 entered into a grazing lease with Defendant Stella Lands, Inc. ("Stella Lands") for the land bounding his purchased property 100 acres to the east. Perez eventually purchased the entirety of stock in Stella Lands. Perez later acquired a portion of the Scarsdale Tract in 1953, which is adjacent to the Stella Tract and adjacent to the disputed property. Perez then used the disputed tract of land to graze cattle.

In 1993, Delacroix filed a petition to enjoin trespass against Perez and in 1994, Perez and Stella Lands filed separate petitions to maintain possession of the property. The district court consolidated the actions and a trial was held over two weeks in February of 1998. In its judgment, the district court found that Perez and Stella Lands possessed the disputed property for over thirty years and acquired ownership of the tract of land by acquisitive prescription.

Delacroix appealed, arguing that Perez had its informal permission to use the property, and as a precarious possessor he could not legally possess for himself. Delacroix also argued that it at all times maintained corporeal possession and title to the property. Perez maintained that he believed the property was his, and that he used it for cattle grazing, hunting, and crawfish farming.

This Court found that Perez used the property with Delacroix's permission and was a precarious possessor, who was presumed to possess on behalf of Delacroix. Since Perez was a precarious possessor, acquisitive prescription could not run in his favor. This Court continued that the record was devoid of any evidence to show that Perez gave Delacroix sufficient notice that Perez terminated

24

his precarious possession with the intent to possess the disputed tract as owner. This Court explained:

> Notwithstanding the fact that Perez's use of the property at issue was open, public and continuous, the evidence indicates that Perez did not take overt steps that would have alerted Delacroix that Perez intended to possess for himself or that Delacroix's property was in jeopardy . . . the record also indicates that Perez allowed Delacroix access to the property which refutes Perez's claim of ownership. The record also indicates that Perez's use of the property did not interfere with Delacroix's exercise of its rights of ownership. During this time, Delacroix granted innumerable oil leases, seismic rights of way and the actual drilling of two oil wells on its property without the interference of Perez.

*Id*. at p. 10, 782 So.2d at 869.

Although *Delacroix* is instructive, we find that *Delacroix* is distinguishable from the facts of this case. Unlike *Delacroix*, in the case *sub judice* the evidence reflects that Bienville's ancestors in title had open, public, continuous and uninterrupted corporeal possession of Lot AA to the exclusion of everyone, including Saxton's estate, from, at the latest 1966, until this lawsuit was instituted. Bienville's ancestors in title also took overt and unambiguous steps that would have alerted Saxton's estate that they intended to possess Lot AA for themselves. For over thirty years, the Holzer Entities conducted its businesses on Lot AA and maintained equipment, i.e., a gas tank, gas pump, trucks and other possessions, on the lot. The Holzer Entities also prohibited others from parking in Lot AA, had vehicles towed from the lot, and erected a fence on Lot AA to prohibit others from entering the lot. As early as 1947, Lot AA was assessed in the name of Holzer Realty, and Holzer Realty paid city taxes on Lot AA until the year 2000. Moreover, from 2001 until 2006, during the time Bruno had corporeal possession of Lot AA, it had exclusive use of Lot AA and paid the taxes on the lot. Likewise, Bienville paid the taxes on Lot AA and had open, uninterrupted and peaceful

25

possession of the lot until the year 2015. Although Mr. O'Brien testified he was billed for and paid taxes on Lot AA, it was not until after he purchased all of the rights to the Saxton succession and placed in possession of Lot AA in 2015 – almost 70 years after Lot AA was assessed in the name of Holzer Realty. As previously noted, when the trial court's factual findings are based on the credibility of witnesses, the court's decision to credit the testimony of certain witnesses must be afforded deference by the reviewing court. *Grieshaber*, 10-1216, p. 6, 63 So.3d at 194.

Accordingly, we conclude the district court was not manifestly erroneous in finding that Bienville, through its ancestors in title, acquired ownership of Lot AA through thirty-year acquisitive prescription. This assignment of error is not persuasive.

## CONCLUSION

For the foregoing reasons, we find that Bienville and its ancestors in title were precarious possessors, who took overt and unambiguous steps that would have alerted Saxton's estate that they intended to possess the property for themselves and acquired the property through acquisitive prescription. We affirm the district court's judgment.

**AFFIRMED**